T.C. Memo. 2017-114

UNITED STATES TAX COURT

THOMAS E. WATTS AND MARY E. WATTS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RW MANAGEMENT, LTD., JRW MANAGEMENT, LLC, TAX MATTERS
PARTNER, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket Nos. 18882-13, 19973-13.         Filed June 14, 2017.

<u>David L. McGee</u> and <u>William V. Linne</u>, for petitioners.

<u>Clint J. Locke</u>, <u>Edwin B. Cleverdon</u>, and <u>Horace Crump</u> for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  By a notice of deficiency dated May 20, 2013, respondent

determined deficiencies in the Federal income tax of petitioners Thomas E. and

Mary E. Watts (Edwin and Mary Watts) for taxable years 2007, 2008, and 2009

**[\*2]** (years at issue) and imposed accuracy-related penalties under section 6662 as follows:[1]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2007 | $522,418 | $104,484 |
| 2008 | 112,317 | 20,463 |
| 2009 | 97,917 | 19,583 |

On August 15, 2013, Edwin and Mary Watts timely filed a petition with this Court for redetermination.

By notice of final partnership administrative adjustment (FPAA) dated May 28, 2013, respondent recharacterized a $754,077 loss as a capital loss, rather than an ordinary loss, for the taxable year 2007 of RW Management, Ltd. (RWM), and imposed an accuracy-related penalty under section 6662. On August 27, 2013, JRW Management LLC, the tax matters partner for RWM, filed a petition for readjustment of partnership items under section 6226.

These cases were consolidated for trial, briefing, and opinion. After concessions by Edwin and Mary Watts, the following issues remain for decision:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the relevant years. All Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*3] (1) whether petitioners' losses on the disposal of their interests in EWGS Partners (Partnership) in tax year 2007 are capital, and (2) whether petitioners are liable for the section 6662(a) accuracy-related penalty for the years at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Edwin and Mary Watts resided in Florida at the time that the petition was filed at docket No. 18882-13. RWM was organized and operated in Fort Walton Beach, Florida, at the time that the petition was filed at docket 19973-13.

RWM is a limited partnership. JRW Management, LLC (JRW), serves as its general and tax matters partner. JRW is a single-member LLC. Ronnie Watts wholly owns JRW and is the only other partner in RWM.[2]

A Brief History of Golf

Brothers Edwin and Ronnie Watts (Watts brothers) founded Edwin Watts Golf Shops (Golf) in 1968, when they opened a small pro shop concession at the Fort Walton Beach Golf Club. From the onset, the Watts brothers maintained close familial control of Golf's operations. Over the years, owing to the Watts

---

[2]For clarity, we distinguish Ronnie Watts, RWM, and JRW only where necessary. We otherwise refer to all three as Ronnie Watts.

[*4] brothers' skill and savvy, Golf developed into a strong regional brand operating in 40 locations across the Gulf Coast. The Watts brothers owned the real estate underlying 27 of those locations in addition to Golf's corporate office and main warehouse. By 2003 Golf was doing nearly $200 million in annual sales, employed hundreds, and was attracting the interest of potential buyers and investors.

Initially, the Watts brothers were hesitant to sell or surrender control of Golf, but eventually Wellspring, a private equity firm, proposed an arrangement they found palatable. Wellspring offered to purchase Golf for roughly $93 million, but to do so in a way which allowed the Watts family to retain an equity interest: join Wellspring in forming a partnership to wholly own Golf. The offer also respected the brothers' ownership of the real estate locations by providing that Golf would remain the brothers' paying tenant. Most attractive to the Watts brothers, however, was Wellspring's express desire to keep the brothers on board to manage Golf's day-to-day operations.

The Watts brothers agreed to Wellspring's terms and consummated the deal in December 2003. On December 2, 2003, Edwin Watts' wholly owned flow-through entities, Edwin Watts Holding Co. (EWHC) and Watts Management

[*5] (WM), formed Partnership, a Delaware partnership.[3] Partnership's exclusive purpose was to own Golf. On December 4, 2003, Edwin Watts and Wellspring--through its wholly owned subsidiary WS Golf Acquisitions, Inc.--executed a purchase agreement wherein Edwin Watts sold Wellspring[4] an 80.5% interest in the newly formed Partnership for $93 million. Of that amount, Edwin reinvested approximately $8 million into Partnership.

Simultaneously with the execution of the purchase agreement, Edwin Watts and Wellspring entered into an amended and restated partnership agreement (agreement) reflecting Wellspring's purchase and status as the majority owner of Partnership. The agreement was drafted in accordance with and subject to Delaware law and governed the partners' roles, rights, and responsibilities as partners in Partnership; the agreement recognized both Wellspring and Edwin Watts as Partnership's general partners.

Reviewing the Agreement Terms

The agreement established two classes of partnership interests: preferred and common. The agreement defined the preferred interests by distinguishing

---

[3]For clarity, we distinguish EWHC, WM, and Edwin Watts only where necessary. We otherwise refer to all three as Edwin Watts.

[4]Similarly, we distinguish WS Golf Acquisition, Inc., and Wellspring only where necessary. We otherwise refer to both entities as Wellspring.

[*6] them from the common interests by way of the rights, powers, and privileges accorded to the preferred interests. Any partner owning preferred interests was defined by the agreement to be a "Preferred Partner".

Wellspring's entire 80.5% interest comprised preferred interests. Edwin owned two tranches of common interests, amounting to 18.5% and 1% of the total Partnership interests.

Powers of the Preferred Partner

While the preferred and common classes voted together as a single class, the two classes diverged by way of the rights, powers, and privileges exclusively granted to the owner of preferred interests. Those preferred partners held the power to appoint three of five board members, exclusive rights of first refusal on resales of Partnership interests, and the ability to convert their preferred interests to common at their discretion or in the event of an IPO. The agreement also entitled the preferred partners to exclusive guaranteed annual payments, a retirement obligation payment, and preferential priority in Partnership liquidating distributions subordinate to creditors but superior to the common partners.

Greater Than 50% Preferred Stake Powers

The agreement provided additional rights and powers to preferred partners owning 50% or more of the outstanding preferred interests. Those partners held

**[\*7]** the exclusive power to approve or veto any amendment to the agreement, any issuance of additional Partnership interests, or Partnership's engagement in any "Exit/Reorganization" transaction. These preferred partners were also provided drag-along rights empowering them to force the minority partners to sell their interests to the preferred partner's chosen purchaser.

Exit/Reorganization Transactions

Generally, section 3.4(b) of the agreement defined an exit/reorganization transaction as one resulting in the conveyance of all or substantially all of Partnership's assets, or the consolidation, merger, liquidation, or transfer of greater than 80% of outstanding Partnership interests. Should Partnership enter an exit/reorganization transaction, section 3.4(c)(i) of the agreement entitled the preferred partners party to the transaction to consideration in an amount as calculated by a formula in section 10.9.

For the purposes of sections 3.4 and 10.9, the agreement viewed the sale of the preferred interests in an exit/reorganization as the sale of an equivalent number of shares in the preferred partner itself, therein defined as the synonymous "Corporate Partner".[5]

---

[5]For example: Wellspring's sale of preferred interests, under the agreement, would not be treated as a sale of preferred interests but would instead constitute

(continued...)

**[*8]** The Exit/Reorganization Valuation of the Preferred Partner

Section 10.9 of the agreement provided that the per share/interest consideration due a preferred partner under section 3.4 must equal "(A) the sum of (x) the amount such Corporate Partner would be entitled to obtain under Section 11 at such time if the Partnership were to liquidate, minus the liabilities of the Corporate Partner, plus (y) the 'Corporate Partner Excess Value'[6] divided by (B) the number of outstanding equity securities of such Corporate Partner on the date of such Transfer".

Section 11 Providing Liquidation Priority

Section 11(c) of the agreement provided the priority order for the distribution of Partnership liquidation proceeds, as applicable for making the required calculations under sections 3.4 and 10.9.  It provided, generally, that liquidation proceeds first had to be used to satisfy any Partnership debts, liabilities, and obligations.  Any remaining proceeds then had to be used to satisfy

---

[5](...continued)
the sale of an equivalent number of shares in WS Golf Acquisitions, its wholly owned holding company directly owning the Partnership interests.

[6]Section 1.1 of the agreement defines "Corporate Partner Excess Value" as the sum of all cash and "Permitted Temporary Investments" held by the corporate partner.  Section 1.1 defines permitted temporary investments as low-risk investments, such as Treasuries, CDs, money market accounts, and P-2 or A-2 commercial paper.

[*9] any accrued but unpaid "Preferred Payment Obligations" (PPO), "Preferred Retirement Obligations" (PRO), and Preferred Allocations.[7] Next, the agreement entitled the preferred partners to proceeds in amounts equal to their "Initial Capital Accounts," reduced by the amounts of any PROs they may have received, followed by distribution of proceeds to the common partners in amounts equal to their initial capital accounts. Only once these priority categories were satisfied would the common and preferred partners share any remaining liquidation proceeds.

Initial Capital Accounts: A Defined Term

"Initial Capital Account" was a defined term, or rather a defined value. Section 1.1 of the agreement defined Wellspring's initial capital account as $85.5 million, which would be increased by the "Cash Assets" reflected on the "Final Closing Cash Assets Statement," as those terms were defined in the purchase agreement.[8] The agreement, referring to the common partners collectively, valued

---

[7]As detailed in article VI of the agreement, these provisions appear to illustrate the agreement's standard partnership accounting and tax item allocation practices.

[8]Again, the term "Purchase Agreement" refers to the separate agreement wherein Edwin Watts sold Wellspring its 80.5% interest in Partnership for approximately $93 million. Although the purchase agreement was executed simultaneously with the agreement and promissory note in the record, petitioners

(continued...)

**[*10]** Edwin Watts' Initial Capital Account as $7,945,000, with no provision for any increase or diminution thereof.[9]

The Preferred Payment and Retirement Obligations

Section 12.1 of the agreement entitled the preferred partners to receive PPOs, which were annual guaranteed payments of 8.4% on the PROs. The preferred partners were entitled to receive PPOs until the earliest of a partnership liquidation, the conversion of preferred interests to common interests, an exit/reorganization transaction, or December 4, 2008.

Section 12.1 of the agreement also entitled the preferred partners to receive PROs, a guaranteed payment of $52.75 million. The preferred partners were entitled to receive PROs upon the earliest of a partnership liquidation, the conversion of preferred interests to common interests, an Exit/Reorganization transaction, or December 4, 2008.

---

[8](...continued)
did not offer this agreement into evidence.

[9]Section 5.2 provided a separate definition for "Capital Account" that reflected the generally understood definition of that term. There, the capital account reflected each partner's initial capital account value increased by any additional capital contributions made by or gains allocated to that partner, decreased by losses allocated or distributions made to that partner, maintained in accordance with Code sec. 704(b).

[*11] The agreement provided that Partnership could satisfy both the PPO and the PRO by means of offset against any current obligations owed to Partnership by the preferred partners. Simultaneously with the execution of the agreement, Wellspring provided Partnership a promissory note, with principal and interest terms identical to those of the PPO and the PRO. This was a term note with no provisions for acceleration, payable on December 4, 2008.

Final Partnership Ownership

By 2007 a number of the common interests had changed hands. Edwin Watts' ownership stake, as held by EWHC and WM, had diminished to 9.2% and 0.5%, respectively. Ronnie Watts, however, now owned 7.76% of the common interests through RWM. The remaining 2.5% of the common interests were split between a member of the extended Watts family and a Wellspring-appointed member of the board of directors.

Wellspring's Desire to Sell

In 2006 Wellspring began looking to sell its investment in Partnership. Wellspring engaged UBS to develop a market for Partnership and vet prospective purchasers. As UBS developed and then whittled down the buyer pool, it sent serious inquiries to the Watts family for further engagement. Owing to their intimate knowledge of Golf's retail operations and their critical relationships with

[*12] their vendors and customers, the Watts brothers were an important element of Wellspring's sale of its Partnership interest.

When the market development period ended, only two names surfaced as serious potential purchasers: Sun Capital (Sun), a private equity firm, and Dick's Sporting Goods (Dick's), a major retailer looking to expand its footprint in the regional golf market.

The Watts brothers were unimpressed with Dick's. While Dick's expressed its desire to integrate the Watts brothers and the Golf brand into its own corporate family, Dick's representations did not speak to the Watts brothers' greatest concerns. The Watts brothers knew the fate awaiting regional chains acquired by Dick's: brand extinction, location consolidation, and the elimination of redundant staff. These outcomes were anathema to the Watts brothers' principal business and personal concerns. The Watts brothers still retained ownership of the retail and business office locations leased to Golf, which provided the family with an annual income stream of $4.4 million. Additionally, Golf employed hundreds, many of whom the Watts brothers had known for years and considered family. A sale to Dick's meant an undesirable outcome for the Watts brothers.

A sale to Sun, however, did not present the Watts brothers with the same concerns. Sun, another private equity firm, was attractive to the brothers for the

**[*13]** same reasons Wellspring had won them over years earlier: autonomy in operating Golf and a continued stream of rental income.

The Watts brothers voiced to Wellspring their opposition to a sale of the Partnership to Dick's. The brothers even threatened to walk away from the business in protest. Although Sun's bid was roughly $35 million less than Dick's bid of $120 million, the Watts brothers implored Wellspring to sell to Sun.

Wellspring sold to Sun.[10] On May 16, 2007, the collective partners executed a purchase agreement with Sun (Sun sale). The purchase agreement provided a nominal purchase price of $85 million, to be adjusted upon closing, reflective of closing costs, expenses, and Partnership's final working capital and indebtedness.

At the closing, Sun paid $87 million for all of Partnership. Approximately $43.8 million of that amount came in the form of Sun's payment of Partnership

---

[10]Other than petitioners' uncorroborated testimony, the record does not indicate what motivated Wellspring's decision to sell to Sun. No representative of Wellspring was called to testify, and no documentation reflecting bids, proposals, negotiated terms, or agreements were entered into evidence.

Petitioners' theory of the case does not reconcile the $35 million difference between the purported Dick's and Sun bids. Wellspring held exclusive power to sell all of Partnership, to drag along the common partners. Petitioners avoided discussion of Wellspring's drag-along rights and did not address any potential damage the Watts brothers' protests and holdout threats may have inflicted on any potential sale to Dick's, and whether this may have resulted in Sun's effectively being the buyer of last resort.

[*14] debts to Regions Bank. Exclusive of fees and other sales expenses, Sun paid the final $34.6 million in proceeds directly to Wellspring, in cash by wire transfer. The common partners--including petitioners--received none of these final cash proceeds.

The Parties 2007 Tax Returns

The Watts brothers longtime accountant Harry Gates prepared their 2007 individual and entity-level tax returns at issue here. Mr. Gates had served as the Watts brothers' primary accountant and adviser for over 35 years, but, he was not asked to participate in, or consult with them before the Sun sale.

After the Sun sale closed, the Watts brothers informed Mr. Gates that they had disposed of their interests in Partnership but that they had received no cash proceeds from the disposition. They provided Mr. Gates with all documents relevant to the Sun sale. Mr. Gates determined that the most appropriate manner of reporting the Watts brothers' disposal of their Partnership interests, for tax purposes, was to treat the transaction as an abandonment of their partnership interests, generating an ordinary loss.

When respondent selected the Watts brothers' returns for examination, Mr. Gates represented petitioners at the administrative level and defended his decision to treat this as an abandonment. Mr. Gates also credibly testified at trial regarding

**[\*15]** his treatment of the transaction for tax purposes and the information about the transaction provided to him by the Watts brothers.

OPINION

I.      Petitioners' Primary Argument:  Substance Over Form

The parties do not dispute the amounts respondent used in his determinations, as respondent used the amounts recognized and reported in petitioners' returns.[11]  Instead the deficiency dispute focuses on respondent's determinations as to the character of the petitioners' losses claimed on the disposal of their Partnership interests.

In contrast to their original return positions, petitioners invite this Court to review the totality of the Sun sale in an alternate light.  Petitioners assert that they

---

[11]Exclusively on brief--in conjunction with their renewed pursuit of ordinary abandonment losses, addressed, infra, section II--petitioners argue for an increase in the amounts claimed as bases of their Partnership interests.  Petitioners appear to suggest the bases reported in their initial returns, and used throughout litigation, are not accurate.  Petitioners neither raised in their petitions any error with respect to basis, nor attempted to present facts or litigate this issue at trial.

"Issues raised for the first time by brief are not properly before" this Court. Aero Rental v. Commissioner, 64 T.C. 331, 338 (1975) (citing Nash v. Commissioner, 31 T.C. 569 (1958), and Theatre Concessions, Inc. v. Commissioner, 29 T.C. 754 (1958)).  Thus we "will not consider this argument", as petitioners "had numerous opportunities to raise this issue, but failed to do so"; and because they did not do so then, we now deem this argument waived, especially in the light of the likely prejudice to respondent.  Id.; see also DiLeo v. Commissioner, 96 T.C. 858, 891 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); Armco, Inc. v. Commissioner, 88 T.C. 946, 963 n.8 (1987).

[*16] agreed to surrender to Wellspring any sale proceeds due them to incentivize Wellspring's sale to Sun. Petitioners' argue this was done with the aim of preserving their Golf-related stream of rental income and saving the jobs of their employees (collectively, the incentive theory). Petitioners' incentive theory argues that the form of the Sun sale, as documented and originally reported, fails to comport with its economic reality. Petitioners argue that we can ascertain economic reality only by looking through the Sun sale. They urge us to examine the transaction as a series of component steps, and to find the existence of an undocumented oral agreement with Wellspring.

Petitioners argue that recognition of the following component steps will accurately reflect the economic reality of the Sun sale: (1) petitioners orally offered to surrender their pro rata share of any sale proceeds to Wellspring, in exchange for Wellspring's agreement to sell to Sun, an offer that Wellspring accepted; (2) upon execution of the Sun sale, petitioners contributed their proceeds to their various flowthrough real estate holding companies; and (3) those companies instantaneously paid those contributed proceeds to Wellspring, pursuant to the oral agreement.

Petitioners argue these transactions resulted in their realization of actual proceeds from the Partnership sale. Their payments of those proceeds to

**[*17]** Wellspring, then, gave rise to the amortizable intangible they seek to amortize here. We are unmoved by petitioners' theory.

When the form of a transaction does not coincide with the economic reality, the substance of the transaction rather than its form should determine the tax consequences. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Glacier State Elec. Supply Co. v. Commissioner, 80 T.C. 1047, 1053 (1983). Taxpayers may assert substance-over-form arguments; however, in such situations taxpayers may face a higher than usual burden of proof. Glacier State Elect. Supply Co. v. Commissioner, 80 T.C. at 1053-1054. Notwithstanding respondent's arguments regarding the application of Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), courts have long held that taxpayers must adduce "strong proof" to establish at trial their entitlement to a new position that is at variance with a position reported in their original returns. Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984) (citing Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 147 (1974)); Ledoux v. Commissioner, 77 T.C. 293, 308 (1981), aff'd per curiam 695 F.2d 1320 (11th Cir. 1983).

To adopt petitioners' incentive theory requires us to hold that petitioners were ab initio entitled to a pro rata share of the proceeds from any sale, that the

[*18] agreement's terms provided them an economic entitlement to property or rights that they could then negotiate to surrender. As discussed below, we reject petitioners' theory because it would require us to ignore the unambiguous terms of the Agreement between petitioners and Wellspring.

We turn initially to petitioners' argument that surrendering to Wellspring their purported entitlement to a pro rata share of the Sun sale proceeds resulted in the creation of an amortizable intangible.

A.      Amortizable Intangible

A taxpayer must capitalize an expenditure when it: (1) creates or improves a separate and distinct asset, (2) produces a significant future benefit, or (3) is incurred in connection with the acquisition or creation of a capital asset. Lychuk v. Commissioner, 116 T.C. 374, 385-386 (2001). Capital expenditures, unlike ordinary and necessary business expenses, must be recovered over time. INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); see also secs. 263, 167, 197.

The amortization of an expenditure begins with determining the amount of the capital outlay, establishing the basis to be amortized. Basis is the capital cost incurred by a taxpayer when buying, creating, or improving an asset. Secs. 167, 197, 1011, 1012. A taxpayer claiming an amortization deduction bears the burden

[*19] of establishing its depreciable basis for that expense's account. See Cluck v. Commissioner, 105 T.C. 324, 337 (1995); Reinberg v. Commissioner, 90 T.C. 116, 139 (1988). Petitioners' incentive theory relies on the presumption that the terms of the agreement guaranteed them rights to a pro rata share of the sale proceeds. It is this share of sale proceeds that they claim to have surrendered, giving rise to the tax benefit--the recovery of basis--they now seek and bear the burden of proving.

B.     Application of Delaware Contract Law

To determine interests in and rights to property for Federal tax purposes, we apply the relevant State law. United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985); Woods v. Commissioner, 137 T.C. 159, 162 (2011). The agreement between petitioners and Wellspring governed their rights as partners. Because the agreement contained a choice-of-law provision specifying Delaware law, we apply the law of that State in interpreting the provisions of the agreement.

A partnership agreement governed by Delaware law will be interpreted using principles of contract law. Norton v. K-Sea Transp. Partners L.P., 67 A.3d 354, 360 (Del. 2013). "The primary goal of contract interpretation is to 'attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted'." Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 13

**[\*20]** (Del. Ch. 2003) (quoting U.S. West, Inc. v. Time Warner, Inc., 1996 Del. Ch. LEXIS 55, at \*28-\*29 (June 6, 1996)).

Unless there is an ambiguity in or an internal conflict among contract provisions, courts must give effect to the parties' intentions as reflected within the four corners of the agreement, construing the agreement as a whole and giving effect to all provisions therein. GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 779-780 (Del. 2012).

Ambiguity does not arise "merely because the parties dispute" what the contract language means. Alta Berkeley VI C.V. v. Omneon, Inc., 41 A.3d 381, 385 (Del. 2012). Ambiguities arise only when the terms of the contract are fairly susceptible of different interpretations or carry different meanings. GMG Capital Invs., LLC, 36 A.3d at 780. Ambiguity does not exist when the court can determine the meaning of a contract without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. AT&T Corp. v. Lillis, 953 A.2d 241, 252 (Del. 2008) (citing Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006)). A contract's defined terms will control when they establish the parties' intent in a manner "that a reasonable person in the position of either party would have no expectations

[*21] inconsistent with the contract language." GMG Capital Invs., LLC, 36 A.3d at 780.

## C. Interpreting the Partnership Agreement

### 1. Preferred Status

The agreement defined a "Preferred Partner" as any partner owning "Preferred Interests." Section 3.2 of the agreement defined the preferred interests by distinguishing them from the common interests by way of the rights, powers and privileges accorded to the preferred interests. Throughout the agreement Wellspring was clearly and unambiguously described as the preferred partner, and its ownership stake comprised preferred interests.

However, petitioners contend that none of the partners was in a preferred position and that Wellspring would achieve preferred partner status only when it paid the Partnership the principal on the $52.75 million promissory note. Petitioners cite for this proposition section 12.1 of the agreement, the provision governing the PPO and the PRO.

Petitioners' contention runs contrary to the unambiguous terms of the agreement.[12] Nowhere in the agreement were the preferred interests' status,

---

[12]This contention also runs contrary to the facts presented at trial. Wellspring appointed three of the five members of the board of directors, received

(continued...)

[*22] powers, rights, or privileges subjected to contingency or qualification.  Had petitioners and Wellspring intended to constrain or make contingent any preferred status, rights or powers, they could have easily done so.  They did not.  The meaning of the agreement, in this regard, is obvious.

2.      Exit/Reorganization and Consideration Thereunder

As relevant here, section 3.4(b) of the agreement clearly defined an exit/reorganization transaction as any transaction transferring ownership of 80% or more of the total Partnership interests.  At the time of the Sun sale, Wellspring owned more than 80% of the total Partnership interests.  Wellspring's divesting itself of its Partnership interests in the Sun sale constituted an exit/reorganization transaction.  Section 3.4(c) of the agreement provided that, in the event of an exit/reorganization transaction, any preferred partners participating in the transaction were entitled to consideration for their interests as calculated under section 10.9.

The formula in section 10.9 of the agreement established a per-interest value for the preferred interests sold in an exit/reorganization transaction.  This formula

---

[12](...continued)
offsetting PPO payments, and likely exercised or attempted to exercise its drag-along rights to trigger the complete sale of the Partnership.  Wellspring held and exercised preferred status and power.

[*23] established that value as the quotient of (1) the sum of the preferred partner's rights to proceeds in a hypothetical Partnership liquidation under section 11 of the agreement, plus or minus (2) the net of certain external variables, all divided by (3) the outstanding equity interests of the partner itself.

     3.     Section 11:  Liquidation Provisions and Priority

Section 11(c) laid out Partnership's liquidation distribution priority.  In an actual or constructive liquidation, the preferred partner would receive payment satisfying any accrued but unpaid PPO,[13] PRO,[14] outstanding preferred allocations,[15] and the adjusted balance of the preferred partner's initial capital account.[16]  The preferred partner's liquidation position was subordinate to Partnership creditors, but superior to that of all common partners.

---

[13]As defined in section 12.1, PPOs were an annual 8.4% on the $52.75 million payment made to Wellspring.

[14]As defined in section 12.1, the PRO constituted a $52.75 million payment to be made to Wellspring on the earlier of, among others, an exit/reorganization transaction or December 4, 2008.

[15]As detailed in article VI of the agreement, these provisions appeared to illustrate Partnership's standard accounting and tax practices.

[16]In addition to the adjustments discussed in, and associated with note 9, supra, section 11(c) provided a liquidation-specific adjustment to the preferred partner's initial capital account, reducing the account value equal to the amount distributed or offset in satisfaction of the PRO.

**[\*24]**  When the parties closed the sale, Sun paid $43.79 million to Regions Bank, extinguishing Partnership's debt.  Accordingly, in a hypothetical liquidation Wellspring's preferred liquidation positions were no longer subordinate to Partnership creditors.  Assuming arguendo that Partnership owed Wellspring no accrued but unpaid PPO, PRO, or preferred allocations that might have otherwise increased the total amount due Wellspring, then Wellspring was entitled to recover to the greatest extent possible its initial capital account of $85.5 million from the proceeds of the hypothetical section 11 Partnership liquidation.

### 4.    Final Section 10.9 Operation

We cannot determine Wellspring's entitlement under section 10.9 as the record is devoid of any evidence regarding the values for the variables defined in the agreement that might have increased or decreased the amount of Wellspring's entitlement.  Petitioners did not provide the Court with any evidence that might have proven helpful in determining the precise amount of consideration due Wellspring in the Sun sale.

In fact petitioners--at trial and on brief--entirely avoid discussing section 10 of the agreement.  Petitioners similarly avoid discussing section 3.4, the liquidation priority provisions, or the impact of any relevant defined terms or Wellspring's $85.5 million initial capital account.  They made no effort to address,

**[\*25]** examine, construe or even allege any ambiguity within the terms of the agreement. Petitioners did not even offer testimony as to their own personal knowledge and understanding of these provisions. They offered no Partnership balance sheets, books, audit statements, or other accounting records as evidence or exhibit. Petitioners called no members of Wellspring or Sun to testify and corroborate their theory at trial.

Petitioners' argument begins with a conclusion: They were entitled to a pro rata share of the cash proceeds from the Sun sale. It ends there, too. Petitioners' conclusory presumption runs contrary to the unambiguous wording of the agreement. Sections 3.4(c) and 10.9 did not provide for a pro rata split; they provided Wellspring a priority payment for its interests in the event of an exit/reorganization transaction, by definition the transaction at issue here.

It is clear to us that these are negotiated contract provisions meant to narrow the preferred partner's exposure to risk, as are arguably all the powers conferred by the agreement on the owners of preferred interests. In the event the marketable value of Wellspring's Partnership stake slipped below its initial investment-- reflected in the agreement as its initial capital account value--these provisions operate to recover Wellspring's investment to the greatest extent possible, even if that recovery comes at the expense of the minority partners.

**[\*26]** We are asked to conclude that petitioners were entitled to a portion of the cash proceeds from the Sun sale. Because of the lack of material facts, we cannot ascertain the total proceeds to which the agreement entitled Wellspring in the Sun sale. And as a corollary, because payment of Wellspring's priority positions is a predicate consideration, we cannot surmise what--if any--proceeds petitioners may have been entitled to.

Petitioners failed to establish they were entitled to any cash proceeds from the Sun sale. It follows, then, that petitioners could not offer to surrender such proceeds to entice or incentivize Wellspring's sale to Sun.[17] Accordingly, the amortizable expense of petitioners' incentive theory fails for lack of proof as to their purported bases.

We decline to further consider petitioners' request for amortization. We need not address whether this purported incentive payment should be capitalized into the existing leases or other assets, nor whether the purported contractual agreement between the Watts brothers and Wellspring might have created a separate and distinctly bargained-for amortizable asset, as petitioners have failed

---

[17]Petitioners did not advance any other ostensible source of funding for their incentive theory (e.g., their own liquid capital, assumption of debts, etc).

[*27] to meet their burden of proving they incurred the expense underlying the now-claimed amortization deduction.

### D. Latent Ambiguities

Under Delaware law, a latent ambiguity may exist when the seemingly unequivocal terms of a contract are rendered ambiguous by extrinsic circumstances to which the contract refers. See Klair v. Reese, 531 A.2d 219, 223 (Del. 1987). Delaware law, however, still requires a determination that a contract is ambiguous on its face--open to competing reasonable interpretations--before courts may construe a latent ambiguity and consider extrinsic evidence to aid in understanding its terms. See Cincinnati SMSA v. Cincinnati Bell Cellular Sys. Co., 1997 Del. Ch. LEXIS 109, at *11-*18 (1997), aff'd, 708 A.2d 989 (Del. 1998); see also Motors Liquidation Co. v. Allianz Insurance Co., 2013 Del. Super. LEXIS 605, at *14 (2013); U.S. West, Inc. v. Time Warner Inc., 1996 Del. Ch. LEXIS 55, at *31 n.10 (1996); Bell Atl. Meridian Sys. v. Octel Commc'ns Corp., 1995 Del. Ch. LEXIS 156, at *18 n.5 (1995).

Petitioners contend their incentive theory harmonizes the zero-proceeds result of the Sun sale with their pro rata entitlement under the agreement; that Wellspring's status as a preferred partner was contingent on the repayment of a promissory note. Petitioners have not invited our attention to any contract

[*28] language that might support their positions, nor have they presented any reasonably developed interpretation of any term or provision of the agreement. As discussed, the provisions of the agreement are unambiguous on their face, and petitioners' presumptions are clearly at odds with those provisions. The record and facts before us offer no hint of latent ambiguity: Objectively, the zero-proceeds result of the Sun sale does not contradict the terms of the agreement as applied to the facts presented.

Consequently, we hold petitioners have failed to satisfy their burden of proof.

II.     Petitioners' Alternative Argument: An Abandonment Loss

On brief petitioners retreat to their original return position,[18] arguing that if we reject their incentive theory, then we must recognize the transaction as an ordinary abandonment loss under section 165.

A.      Burden of Proof

The Commissioner's determinations are presumed correct, and taxpayers generally bear the burden of proving entitlement to the deductions they claim.

---

[18]Other than mentioning it as an afterthought--as the last sentence in petitioners' opening statement--this argument appears nowhere else in the record. Petitioners did not present any evidence as to this contention at trial. Arguably, petitioners abandoned this argument before petitioning this Court for redetermination.

[*29] Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992). In certain circumstances, the burden of proof shifts to the Commissioner when a taxpayer introduces credible evidence with respect to any relevant factual issue. Sec. 7491(a)(1). Petitioners do not contend, and the record does not establish, that we ought shift to respondent the burden as to any issue of fact. We therefore decline to do so.

B.    Section 741 or Section 165?

Generally, section 741 requires that taxpayers recognize as capital all gains or losses realized in the sale or exchange of a partnership interest--except to the extent section 751 applies.[19] To the extent that a noncorporate taxpayer incurs capital losses, the taxpayer may deduct those capital losses currently against capital gains and up to $3,000 of ordinary income. Secs. 165(f), 1211(b). Section 165(a) provides taxpayers ordinary loss deductions for abandonment losses. To qualify for an abandonment loss, a taxpayer must demonstrate that: (1) the transaction under review does not constitute a sale or exchange and (2) he or she abandoned the asset, intentionally and affirmatively, by overt act. Sec. 1.165-2,

---

[19]Neither party raised any argument nor presented any evidence of unrealized receivables or inventory held by the Partnership, foreclosing our consideration of any portion of a potential loss receiving ordinary treatment under sec. 751.

[*30] Income Tax Regs.; see Citron v. Commissioner, 97 T.C. 200, 209-215 (1991) (citing Middleton v. Commissioner, 77 T.C. 310, 319-324 (1981), aff'd, 693 F.2d 124 (11th Cir. 1982)).

Subject to the prohibition on sales or exchanges giving rise to ordinary abandonment losses, partnership interests may be abandoned. Echols v. Commissioner, 935 F.2d 703 (5th Cir. 1991), rev'g and remanding 93 T.C. 553 (1989); Citron v. Commissioner, 97 T.C. at 213.

When a partner is relieved of his or her share of partnership liabilities, the partner is deemed to receive a distribution of cash. Sec. 752(b). Section 731(a) requires distributions to partners to be treated as payments arising from the sale or exchange of a partnership interest. Secs. 752(b), 731(a); Citron v. Commissioner, 97 T.C. at 214-215 n.11. Thus, ordinary abandonment losses may arise only in a narrow circumstance where the partner: (1) was not personally liable for the partnership's recourse debts or (2) was limited in liability and otherwise not exposed to any economic risk of loss for the partnership's nonrecourse liabilities. See sec. 752(b), (d); sec. 1.752-3, Income Tax Regs.; see also Commissioner v. Tufts, 461 U.S. 300 (1983).

Respondent determined petitioners' disposal of their Partnership interests did not fall within these narrow exceptions. Accordingly, respondent

[*31] recharacterized petitioners' losses from ordinary abandonment losses to capital losses on the sale or exchange of the interests.

In contesting this determination, petitioners were tasked with the burden of proving respondent's determination incorrect. Petitioners have not met this burden. Petitioners presented no documentary or testimonial evidence to establish their eligibility for an abandonment loss deduction. Petitioners failed to prove their individual shares of any Partnership liabilities, capital restoration obligations, or lack thereof, in the light of documentary evidence suggesting otherwise. Additionally, petitioners did not offer any evidence or analysis as to how their actions constituted an intentional and overt manifestation of abandoning their Partnership interests.

In nearly every filing with the Court, and at trial, petitioners repeatedly characterized the abandonment loss positions taken on their returns as erroneous.[20] To that extent, we agree. Accordingly, respondent's determination is sustained.

---

[20]For example: Petitioners stipulated that they were "not entitled to ordinary losses" on the "sale of their partnership interests in EWGS" and that they are "liable for capital gains on the sale of their" Partnership interests.

**[\*32]** III.    <u>The Section 6662 Penalty</u>

    A.    <u>Generally</u>

Section 6662(a) and (b)(1) and (2) imposes a penalty in an amount equal to 20% of the portion of an underpayment attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax. This accuracy-related penalty will not apply to any portion of an underpayment for which a taxpayer establishes that he or she had reasonable cause and acted in good faith. Sec. 6664(c)(1).

In the notice of deficiency issued to petitioners Edwin and Mary Watts, respondent determined they were liable for the section 6662 penalty for all three of their years at issue. In the FPAA respondent determined petitioner RWM was also liable for the section 6662 penalty, as related to its sale of Partnership interests.

The determination of whether petitioners acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances, including their efforts to assess their proper tax liability, their knowledge and experience, and the extent to which they relied on the advice of a tax professional. <u>See</u> sec. 1.6664-4(b)(1), Income Tax Regs.

As to RWM, this determination is made at the partnership level, taking into account the state of mind of the general partner. <u>Superior Trading, LLC v.</u>

**[\*33]** <u>Commissioner</u>, 137 T.C. 70, 91 (2011), <u>aff'd</u>, 728 F.3d 676 (7th Cir. 2013). Ronnie Watts, as the sole "owner" of the partners of RWM, was the only individual with authority to act on behalf of RWM, and thus his actions are pertinent in establishing a reasonable cause defense for RWM.

Whether a taxpayer has reasonable cause within the meaning of section 6664(c) may depend upon whether the taxpayer exercised "ordinary business care and prudence" in relying on the tax advice of his or her chosen professional. <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 98-99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

B.    <u>Reasonable Cause and Good Faith</u>

We understand petitioners to contend that no penalty should be imposed against them, with respect to their losses on the sale of their Partnership interests, because their initial return position was taken with reasonable cause and in good faith, or more particularly, in reliance on the advice of their longtime accountant, Mr. Gates.

Mr. Gates credibly testified that petitioners provided him with all pertinent facts and materials necessary to accurately report their tax liabilities on the sales of their Partnership interests. Mr. Gates testified his research led him to determine they could report the disposition as an abandonment loss of ordinary character, a

[*34] position Mr. Gates defended as their representative throughout their pre-petition administrative proceedings.

While Mr. Gates' determination was incorrect, it was reasonable and prudent for petitioners to rely on his advice and direction as to the intricate subject matter at hand. Mr. Gates served as their accountant and adviser for over 30 years, and had sufficient experience and expertise in the field to justify his retention by the Watts family and their reliance on his professional opinion. We hold that petitioners are not liable for the section 6662(a) penalty for the portion of the underpayment arising from the erroneous reporting of the sale of their Partnership interests in 2007. See Walker v. Commissioner, T.C. Memo. 2016-159, at *10-*12; see also Rawls Trading, L.P. v. Commissioner, T.C. Memo. 2012-340.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

**[\*35]**  To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent in docket No. 19973-13, except</u>

<u>with respect to the accuracy-related penalty</u>

<u>under section 6662(a).</u>

<u>Decision will be entered under</u>

<u>Rule 155 in docket No. 18882-13</u>.