T.C. Memo. 2020-144

UNITED STATES TAX COURT

THOMAS E. WATTS AND MARY E. WATTS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

RW MANAGEMENT, LTD., JRW MANAGEMENT, LLC, TAX MATTERS
PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket Nos. 18882-13, 19973-13.          Filed October 15, 2020.

David L. McGee, Marcus A. Huff, and William V. Linne, for petitioners.

Clint J. Locke, Edwin B. Cleverdon, Horace Crump, and Nathaniel S.

Pollock, for respondent.

---

[*]This opinion supplements our previously filed opinion Watts v.
Commissioner, T.C. Memo. 2017-114, vacated and remanded, 747 F. App'x 837
(11th Cir. 2019).

**[*2]**                    SUPPLEMENTAL MEMORANDUM OPINION

NEGA, Judge:  These cases are before us on remand from the U.S. Court of

Appeals for the Eleventh Circuit.  Watts v. Commissioner (Watts II), 747 F. App'x

837 (11th Cir. 2019), vacating and remanding Watts v. Commissioner (Watts I),

T.C. Memo. 2017-114.  We held in Watts I that petitioners' losses on their

disposal of their interests in EWGS Partners (Partnership) were capital losses (first

issue), as respondent determined.  We also held that petitioners were not liable for

the accuracy-related penalties, contrary to respondent's determination.  Our

holding on the first issue followed from our assumption that Wellspring, one of

the Partnership's partners, had made a certain election that the partnership

agreement allowed.  That election, we concluded, meant that petitioners were not

entitled to any of the proceeds from the sale of the Partnership interests and,

accordingly, led to a holding that respondent's determination that the losses were

capital was correct.

On appeal, the parties agreed that Wellspring never made the referenced

election.  Accordingly, the Court of Appeals in Watts II remanded these cases to

us to reconsider the first issue without taking the referenced assumption into

account.  The Court of Appeals suggested that we, on remand, rule on whether the

[*3] Danielson rule applies.  See Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965).  The Court of Appeals further suggested that we rule on whether petitioners proved that the Watts family had a separate, enforceable oral agreement with Wellspring "that predated the purchase by Sun Capital [(Sun)] and, if so, whether the Watts family's incentive payments to Wellspring constituted amortizable capital expenditures."  Watts II, 747 F. App'x at 838.

We set forth below our reasoning on these matters on remand.  Both respondent and petitioners filed supplemental briefs as to those matters.

## Background

We incorporate herein the facts in Watts I and repeat in the "Discussion" section only the facts that are necessary for our decision.

## Discussion

I.    The Danielson Rule

The U.S. Court of Appeals for the Eleventh Circuit suggested that we address whether the Danielson rule applies in these cases.  We conclude that it does.

The Court of Appeals for the Third Circuit in Commissioner v. Danielson, 378 F.2d at 775, held that the invocation of the substance-over-form doctrine by

[*4] taxpayers is restricted in certain circumstances. Danielson determined the tax treatment of proceeds received by a company's shareholders in exchange for two things: (1) their stock in the company and (2) their promise that after the sale they would not compete with the company (such a promise is known as a noncompete covenant). Id. at 773. Their agreement with the buyer stated that 41% of the price was for the noncompete covenant and 59% was for the stock. Id. The shareholders contended that the entire price was in "fact" and in "business reality" a payment for the stock. Id. at 774. They argued that the 41%/59% allocation in the agreement should be disregarded for purposes of determining the tax consequences of their receipt of the proceeds. Id. The Court of Appeals rejected the shareholders' argument, id. at 774-775, 778, and held, id. at 775: "[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." The Court of Appeals further held that if the shareholders had attempted, in an action against the buyer, "to avoid or alter the [sale] agreement * * * [they] would have a heavy burden of showing fraud, duress, undue influence and the like under what may loosely be called common-law principles", id. at 778-779, and that

**[*5]** "examination of all the evidence adduced in this case reveals nothing to demonstrate that the contract as written was not the taxpayers' [i.e., the shareholders'] conscious agreement", Commissioner v. Danielson. 378 F.2 at 779.

The Danielson rule applies to a taxpayer's argument only if the agreement in question is unambiguous. CMI Int'l, Inc. v. Commissioner, 113 T.C. 1, 4 (1999) ("If the contract is ambiguous, however, the Danielson rule does not apply." (citing N. Am. Rayon Corp. v. Commissioner, 12 F.3d 583, 589 (6th Cir. 1993), aff'g T.C. Memo. 1992-610)). The Court of Appeals for the Eleventh Circuit has expressly adopted the Danielson rule. See Peterson v. Commissioner, 827 F.3d 968, 987 n.30 (11th Cir. 2016), aff'g in part, dismissing in part T.C. Memo. 2013-271; Plante v. Commissioner, 168 F.3d 1279, 1280-1281 (11th Cir. 1999), aff'g T.C. Memo. 1997-386; Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984).

Respondent asserts that the Danielson rule is applicable in these cases because petitioners are attempting to unilaterally recast the transaction and that attempt, if successful, could result in different tax consequences for Wellspring. Petitioners respond that the Danielson rule does not apply because, in their view, they do not seek to change the tax consequences of the transaction by challenging the underlying agreements and reforming the contractual terms but, rather, are

**[*6]** explaining the tax consequences of the transaction. According to petitioners, they agree that 100% of the net proceeds from the Sun sale was paid to Wellspring at closing, just as the purchase agreement provides. Petitioners argue that, instead, they seek to establish the reason that all of the proceeds went to Wellspring at closing, an issue that is not addressed in the purchase agreement. As they see it, they are considered to have received their pro rata portions of the net sale proceeds and then simultaneously to have transferred those portions of the proceeds to Wellspring. Petitioners assert that they agreed to surrender to Wellspring their portions of the net sale proceeds with the aim of preserving their stream of rental income from Edwin Watts Golf Shops (Golf) and saving the jobs of their employees (collectively, incentive theory). Petitioners argue that the form of the Sun sale, as documented and originally reported, fails to comport with the sale's economic reality when understood in the setting of the incentive theory. Petitioners argue that we can ascertain economic reality only by looking through the Sun sale. This argument is without merit.

The <u>Danielson</u> rule applies to preclude petitioners from reaping favorable tax benefits by recharacterizing their transaction from one in which, as the agreement provided, 100% of the net proceeds were paid to Wellspring as consideration for the sale. The <u>Danielson</u> rule is applicable in situations, as here,

[*7] where parties to a transaction expressly agree to a characterization of a transaction in a particular form or intentionally structure a transaction in a particular form for tax purposes, and it is intended to prevent any party from unduly enriching itself by claiming a unilateral alteration of the agreed-upon consequences after the consummation of the transaction. Here, the purchase agreement, at section 11.10 states: "This Agreement * * * constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any prior and contemporaneous understandings, agreements, negotiations, discussions or representations by or between the parties hereto, written or oral, with respect to such subject matter".

The purchase agreement preamble states that "the Common Partnership Sellers desire to sell their Common Partnership Interests to * * * [Sun], and * * * [Sun] desires to purchase such Common Partnership Interests from the Common Partnership Sellers, upon the terms and subject to the conditions set forth in this Agreement."

Petitioners argue that the relevant provisions of the purchase agreement should be disregarded and that the parties instead intended for petitioners (but not the other common partners) to receive portions of the Sun sale proceeds. The purchase agreement is plain and establishes which parties got what--Wellspring

**[*8]** was to receive all of the net sale proceeds and the common partners were to receive nothing. And that is what happened. Moreover, petitioners did not adduce proof that the above-referenced agreement would be unenforceable because of mistake, undue influence, fraud, duress, or the like, as required under the Danielson rule.

Moreover, contrary to petitioners' argument, the interests of petitioners were not fully aligned with the interests of Wellspring during the sale negotiations, as is evident from the distinct rights set out in the partnership agreement. In addition, testimony regarding the negotiations leading up to the Sun sale, such as the drafting of the final purchase agreement, would be expected to take into account these competing interests. "If a party could alter the express terms of his contract by arguing that the terms did not represent economic reality, the Commissioner would be required to litigate the underlying factual circumstances of 'countless' agreements." N. Am. Rayon Corp. v. Commissioner, 12 F.3d at 587. Also, business agreements are often structured with an eye toward their tax consequences. Allowing one party to realize a better tax consequence than the consequence for which it bargained is to grant "a unilateral reformation" of the agreement, which considerably undermines the certainty of business deals. Commissioner v. Danielson, 378 F.2d at 775. We reject petitioners' incentive

**[*9]** theory because it would require us to discount the unambiguous terms of the purchase agreement between petitioners and Wellspring. The <u>Danielson</u> rule applies in these cases, and the tax consequences flowing from the transaction result from the terms of the purchase agreement. Pursuant to those terms, petitioners were not entitled to (and did not) receive any of the sale proceeds in exchange for their interests in the Partnership. We, therefore, once again sustain respondent's determination on this matter.[1]

## II. No Right To Receive Proceeds

Notwithstanding our just-espoused holding, even if we were to assume arguendo that the <u>Danielson</u> rule does not apply, petitioners cannot prove the details of the incentive theory, which is predicated on the conclusion that they had an absolute right to receive a portion of the proceeds from the Sun sale.

Petitioners argue that they are entitled to pro rata shares of the cash proceeds from the Sun sale and that <u>Watts I</u> misinterpreted. At the time of the Sun sale, Wellspring owned 80.1% of the Partnership interests, while Edwin Watts Holding Co. (owned by Edwin Watts) owned 9.2%, RW Management, Ltd.

---

[1]Petitioners argued alternatively in <u>Watts I</u> that they would be entitled to an abandonment loss were we to reject their incentive theory. We rejected that alternative argument in <u>Watts I</u>, and the U.S. Court of Appeals for the Eleventh Circuit has not directed us to consider the issue further. We, therefore, do not.

[*10] (RWM), owned 7.76%, and Watts Management owned 0.5%. As the owner of their respective percentage interests in the Partnership, petitioners conclude, Watts and RWM were entitled to receive proportionate shares of the proceeds from the sale of the Partnership to Sun and nothing in the partnership agreement provides otherwise. Petitioners assert that they would not have invested such a substantial sum in the Partnership if they had had no means of recovering their $8 million investment (and any profits) upon the sale of their Partnership interests.

In Watts I this Court found that petitioners did not prove they were entitled to receive any proceeds from the Sun sale. This remains true. On appeal petitioners argued, and respondent agreed, that the record does not indicate that the method Wellspring used to retain all the sale proceeds was to make an election under section 3.4(c) of the partnership agreement, which would result in Wellspring's being entitled to receive preferred consideration on the basis of the formula set out in the partnership agreement. However, the partnership agreement gave Wellspring several other avenues to ensure that it received all of the sale proceeds. Specifically, the partnership agreement gave Wellspring power under the tag-along rights and bring-along rights provisions of sections 10.4 and 10.5, respectively, to ensure that the common partners' shares of sale proceeds would be determined under the partnership's liquidation provisions, under which Wellspring

[*11] had a priority position. Therefore, Wellspring had the ability to ensure it received its capital account balance and other preferred distributions before the common partners.

It was possible that Wellspring would not elect to use the tag-along rights or bring-along rights provision, in which case the common partners would be entitled to whatever purchase price they negotiated for themselves. This result, however, is unlikely, because: (1) Wellspring had an economic incentive to use the tag-along rights or bring-along rights provision; (2) it appears likely (and we find) that Wellspring forced the common partners into the Sun sale; and (3) the actual distribution of the Sun sale proceeds entirely to Wellspring suggests that the parties implicitly or explicitly used the tag-along rights or bring-along rights provision.

Finally, as this Court stated in Watts I, petitioners called no members of Wellspring or Sun to testify and corroborate their incentive theory at trial and offered no Partnership balance sheets, books, audit statements, or other accounting records as evidence or exhibit. In their brief petitioners point to testimony by Edwin Watts' son as establishing that they were entitled to pro rata shares of the proceeds. This Court, however, is under no obligation to accept self-serving testimony, see, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986), and we

[*12] decline to accept that testimony simply on the basis of the spoken words. Therefore, petitioners have failed to establish they were entitled to any cash proceeds from the Sun sale.

III.    No Oral Agreement

Assuming again that the Danielson rule does not apply in these cases, and assuming that petitioners had an absolute entitlement to pro rata shares of the cash proceeds from the Sun sale, petitioners have not proven that they had entered into a separate, enforceable oral agreement with Wellspring that would change the result in these cases.

Petitioners argue that Edwin Watts, RWM, and Wellspring entered into a separate agreement apart from the purchase agreement, pursuant to which Edwin Watts and RWM agreed that they would surrender the shares of the proceeds from the Sun sale to which they were entitled in order to incentivize Wellspring to sell to Sun instead of to Dick's Sporting Goods (Dick's).  They conclude that this agreement resulted in particular tax consequences for each of them.

At trial petitioners offered testimony regarding the circumstances surrounding the Sun sale in an effort to show that Edwin and Ronnie entered into an oral agreement incentivizing Wellspring to sell the Partnership to Sun instead of to another prospective purchaser.  However, they did not present any evidence

[*13] related to Wellspring's view of the circumstances of the Sun sale, such as through testimony from a Wellspring representative regarding the existence of an oral agreement.

According to petitioners, Dick's made an oral offer to purchase the Partnership, contemporaneously with Sun's offer. Petitioners state that the Dick's bid was $120 million, which was $35 million more than Sun's bid, but provided no other details of the offer. Petitioners state that Edwin and Ronnie preferred Sun's offer over the Dick's offer because Sun would be more likely to continue operating the existing Golf locations, with existing Golf employees and underlying real estate leases, whereas they believed Dick's would shutter the existing Golf locations, thereby terminating Golf employees as well as their leases.

Petitioners posit that Wellspring would have pursued a sale with Dick's, absent Edwin's and Ronnie's agreement to forgo their sale proceeds. But petitioners did not reconcile the substantial differences in the Dick's and the Sun bids. Petitioners state that the Dick's bid exceeded the Sun bid by $35 million, and they claim they were able to persuade Wellspring to accept the Sun bid and reject the Dick's bid by offering approximately $6 million. The wide gap between the Sun bid and the Dick's bid suggests there were other elements of the Dick's offer that rendered it unfeasible for Wellspring.

**[\*14]** In fact, testimony at trial showed that Edwin and Ronnie were so against a sale to Dick's that they threatened to leave the business if the Partnership was sold to Dick's. If in fact Dick's intended to close down Golf locations and terminate Golf's employees, Edwin's and Ronnie's threat to leave the business would not carry much weight.

Other evidence that supports our conclusion that petitioners did not have a separate, oral agreement with Wellspring includes the fact that: (1) Edwin's and Ronnie's Federal income tax returns for 2007 did not reflect the characterization of the Sun sale posited by petitioners; (2) as discussed above, the entire agreement provision of the purchase agreement indicates there was no separate, enforceable agreement; and (3) petitioners do not attempt to address why the other common partners would also forgo their rights to Sun sale proceeds, considering they did not also have leases or a workforce to protect.[2]

---

[2]In addition, as we have discussed above, petitioners have failed to establish they were entitled to any cash proceeds from the Sun sale. It follows, then, that petitioners could not offer to surrender such proceeds to entice or incentivize Wellspring's sale to Sun. Accordingly, the amortizable expense of petitioners' incentive theory fails for lack of proof as to their purported bases. We decline to further consider petitioners' request for amortization. We need not address whether this purported incentive payment should be capitalized into the existing leases or other assets, nor whether the purported contractual agreement between the Watts brothers and Wellspring might have created a separate and distinctly bargained-for amortizable asset, as petitioners have failed to meet their burden of

(continued...)

**[*15]** In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

Appropriate decisions will be entered.

---

[2](...continued)
proving they incurred the expense underlying the now-claimed amortization deduction.