T.C. Memo. 2021-104

UNITED STATES TAX COURT

ESTATE OF CHARLES P. MORGAN, DECEASED, ROXANNA L. MORGAN,
PERSONAL REPRESENTATIVE AND ROXANNA L. MORGAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 592-18.                    Filed August 23, 2021.

Ljubomir Nacev and Simon Y. Svirnovskiy, for petitioners.

Richard J. Hassebrock and Richard L. Wooldridge, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, Judge:  In a notice of deficiency dated October 13, 2017, respondent

determined the following deficiency and accuracy-related penalty:[1]

_____

[1] Unless otherwise indicated, all section references are to the Internal
Revenue Code (Code) in effect at all relevant times, and all Rule references are to
the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded
to the nearest dollar.

[*2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2012 | $368,659 | $73,732 |

The issues for decision are whether petitioners: (1) were carrying on a trade or business during the year in issue and are therefore entitled to deductions claimed on Schedule C, Profit or Loss From Business, and Schedule E, Supplemental Income and Loss, for expenses incurred by Falcon, LLC (Falcon), and Falcon Legacy, LLC (Legacy); (2) are entitled to a net operating loss (NOL) deduction attributable to an alleged NOL carryover from tax years 2010 and 2011; and (3) are liable for an accuracy-related penalty under section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference. Charles Morgan and Roxanna Morgan were married residents of Indiana when they timely filed their petition.[2]

---

[2] Mr. Morgan died in April 2019, and Mrs. Morgan was appointed the personal representative of the Estate of Charles P. Morgan. We granted petitioners' subsequent motion to substitute parties and change caption pursuant to Rule 63(a).

[*3] I.    Background

    A.    Homebuilding Business and Receivership

Mr. Morgan was a residential real estate developer.  He earned an M.B.A. degree in 1969 and then worked in the real estate industry for other firms for over a decade.  In 1983 he began his own home building company, which came to comprise a variety of entities, including:  C.P. Morgan Communities, L.P. (CPMC); C.P. Morgan Communities of Charlotte, LLC; C.P. Morgan Communities of the Triad, LLC; the C.P. Morgan Co., Inc.; and C.P. Morgan Investment Co., Inc. (collectively, Morgan entities).  Over 26 years--from 1983 to 2009--the Morgan entities built over 26,000 homes in Indiana and North Carolina.  Throughout that period Mr. Morgan owned them directly or indirectly and was involved in their operations and management.

In the years leading up to 2009 the real estate and financial markets began to decline.  So did the Morgan entities' homebuilding business.  In 2008 their creditors began to rescind credit.  By February 2009 the Morgan entities had outstanding obligations of approximately $75 million in default and unpaid notwithstanding a demand for payment from those creditors.  Consequently, the creditors filed a "Complaint on Unpaid Indebtedness and for the Appointment of Receiver" in Indiana superior court.  It alleged that the Morgan entities were hopelessly insolvent.  In March 2009 the Indiana superior court entered an order

[*4] appointing LS Associates, LLC (LS Associates or receiver), as receiver for all five Morgan entities.

Appointed to manage all the affairs of the Morgan entities, LS Associates' task was to identify, take possession of, and liquidate the Morgan entities' assets. During the pendency of the receivership proceedings--which included tax years 2010 through 2012--LS Associates was in sole control of the Morgan entities, under the supervision and subject to the approval of the Indiana superior court. It immediately exercised that exclusive control and did not relinquish it until the receivership concluded in 2013.[3] Given the depressed market and the lenders' unwillingness to fund the Morgan entities' operations going forward, LS Associates did not consider using the receivership to retool and find a new buyer.[4]

---

[3] Having liquidated the receivership estates of the Morgan entities, distributed funds and property, and filed the final tax returns for the Morgan entities, LS Associates filed (and was granted) a motion to terminate receivership proceedings and release receiver with the Indiana superior court in May 2013.

[4] The order appointing LS Associates as receiver noted that the current value of the collateral securing the Morgan entities' obligations was insufficient to discharge the debts owed to the creditors. The creditors believed the remaining deficiency loan balance after liquidation and sale of the collateral might be as much as $50 million. The Morgan entities "acknowledged that, in light of the * * * [creditors' revocation of the Morgan entities'] authority to use cash collateral in the operation of their businesses, * * * [the Morgan entities] do not have sufficient means to carry on their respective business activities and operations."

**[*5]**    Mr. Morgan was prohibited from infringing on LS Associates' authority or incurring expenses on behalf of the Morgan entities, and he never sought permission to incur any expenses.  Following the appointment of the LS Associates, Mr. Morgan spent about six months relaxing and spending time with his family.  But Mr. Morgan was a hard worker who was not interested in retirement or remaining idle.  In September 2009 he wrote:

> I am really focused on what my next career is.  I[t] has been six months since I shut the Company down and it has been a great summer of rest and time with my family.  Career 2 will almost certainly involve acquiring a company * * * or starting another company probably in the real estate building field but approaching it differently than I did in my first career.

B.    Postreceivership Activity:  Legacy

Mr. Morgan conducted a search for a trade or business through Legacy, a single-member limited liability company (LLC) he had formed in December 2008 and which was taxed as a disregarded entity for 2010 through 2012.  He was looking for businesses that met certain financial and logistical parameters, and he did not confine his search to any one industry.

Legacy employed certain former CPMC employees, including Kristen Coyer as director of finance.  Legacy employees kept timesheets, allocating time not just to Legacy's business search but also to the Morgans personally and to Falcon.  For

[*6] 2011 and 2012 Mr. Morgan recorded 100% of his time spent working for Legacy as "business search/forward looking".

In addition to hiring former CPMC employees, Legacy hired various outside consultants to assist in its search for new business opportunities. Generally, the consultants would contact Mr. Morgan with business opportunities; and if he was interested, he would enter into a nondisclosure agreement with the selling entity to discuss the specific opportunity further. Despite these efforts Mr. Morgan did not make an offer to purchase--nor did he acquire or otherwise form--a new business as a result of Legacy's search before the end of 2012.[5]

Apart from Legacy, Mr. Morgan indirectly maintained contact with the homebuilding industry. In 2009 Mr. Pyatt, the former vice president of CPMC and a close friend and business partner of Mr. Morgan, became aware that a number of partially developed properties owned by the Morgan entities were available for

---

[5] The parties introduced evidence that in 2015 Mr. Morgan formed PM Development Holdings, LLC, with Todd Pyatt and Pyatt Builders, LLC (Pyatt Builders), and that in 2017 he acquired Southeastern Aluminum Products, Inc., a manufacturer and distributor of bath enclosures and shower doors for residential and commercial buildings. We do not find these facts from later years relevant to our redetermination of the amount of petitioners' income tax deficiency for 2012. See sec. 6214(b); cf. Capitol Fed. Sav. & Loan Ass'n & Sub. v. Commissioner, 96 T.C. 204, 215 (1991). We also note that tax years 2013, 2014, and 2015 are before the Court at docket No. 16442-19.

[*7] purchase from the receiver.  He approached Mr. Morgan about partnering to purchase and develop the properties.  Mr. Morgan instead lent Pyatt Builders $180,000 so it could purchase the property from the receiver, using a single-member LLC he owned and used as a vehicle for lending money.  Mr. Morgan did not hold an ownership interest in Pyatt Builders and was not involved in the daily activities of the business.  The loan was repaid, timely and with interest, in July 2010.  Mr. Morgan's close relationship with Mr. Pyatt influenced his willingness to extend the loan.

### C.    Aircraft:  Falcon

Finally, throughout this time Mr. Morgan continued to fly aircraft owned by Falcon, an entity he had formed in 1996 to hold, operate, and maintain aircraft.

Before the receivership proceedings, Mr. Morgan used Falcon's aircraft to further the Morgan entities' real estate development business; he visited potential building sites, researched development strategies, and checked on current developments.  CPMC had an aviation department that employed the pilots, mechanics, and recordkeepers that flew, serviced, and kept track of the books and records for the aircraft held by Falcon.

During the receivership proceedings Mr. Morgan continued to use Falcon's aircraft in his search (through Legacy) for new business opportunities.  Falcon did

**[*8]** not lease its aircraft or provide services to any unrelated third parties at any time. Mr. Morgan had a passion for aviation and both before and during the receivership proceedings often would pilot the aircraft himself.

For 2010 and 2011 Falcon was taxed as a partnership, and its partners included Mr. Morgan and an S corporation. For 2012 Mr. Morgan was Falcon's sole owner, resulting in the partnership's termination and Falcon's taxation as a disregarded entity. Falcon's principal business activity was listed as "Consulting" on its 2010 and 2011 Forms 1065, U.S. Return of Partnership Income, and on petitioners' 2012 Schedule C.

II.     Petitioners' Tax Return

Petitioners filed a joint Form 1040, U.S. Individual Income Tax Return, for 2012. It was prepared by Roy Rice of Somerset CPAs (Somerset), a firm in Indianapolis, Indiana.[6] Mr. Rice was petitioners' return preparer for over three decades and had been at Somerset since 1999. Following the recession, Mr. Rice and Ms. Coyer discussed how Falcon's expenses would be paid and deducted, and Mr. Morgan subsequently signed an "expense reimbursement policy" as both the Chairman of CPMC and a member of Falcon. Legacy's monthly meeting agenda

---

[6] Mr. Rice and Somerset also prepared petitioners' individual returns for 2010 and 2011 as well as the Morgan entities' returns for 2010 through 2012.

[*9] from January 2011, prepared by Ms. Coyer and distributed to petitioners, indicates that Mr. Rice joined to "review entities" and "discuss business expense/ deductions". For 2012 Ms. Coyer provided Mr. Rice and Somerset information used to prepare the returns; Ms. Coyer and Mr. Rice would communicate through the year and Mr. Rice could ask Ms. Coyer for clarification and additional input as needed. Both Mr. Rice and Ms. Coyer were licensed certified public accountants at all relevant times.

### A. Falcon Expenses

Petitioners attached Schedule C for Falcon to their 2012 Form 1040. Falcon reported a loss of $303,302. Gross income totaled $516,654 and comprised a $315,000 fee Legacy paid for consulting and $201,654 petitioners paid for the personal use of Falcon aircraft. Total expenses were $819,956, all related to the use and maintenance of Falcon's aircraft.

For 2010 and 2011 Falcon's Forms 1065 show each partner's capital account but do not show each partner's outside basis. Mr. Rice used the partner's capital account on the Forms 1065 to report Mr. Morgan's outside basis on Schedule K-1, Partner's Share of Income, Deductions, Credits, etc. Falcon is the sole member of Falcon II, LLC, which either owned or merged with other "Falcon" entities

[*10]  (including Falcon VII, LLC), which contracted for the purchase of a helicopter in 2008.

### B.    Legacy Expenses

Petitioners also attached Schedule E to their 2012 Form 1040, on which they reported expenses related to Legacy.[7]  Legacy reported no gross receipts.  It reported total expenses of $648,118, which included the consulting fee paid to Falcon, "[b]usiness [i]nvestigations [e]xpenses" of $121,715, and other expenses related to the former CPMC employees' tasks of searching for business opportunities, providing personal services to the Morgans, and managing Falcon.

### C.    NOL Deduction

Petitioners claimed an NOL deduction of $966,121 on their 2012 Form 1040, attributable to NOL carryforwards of $35,083 and $931,038 from tax years 2010 and 2011, respectively.

---

[7] Petitioners reported Schedule E expenses paid or incurred by Legacy on a "Statement SBE, Supplemental Business Expense" attached to their Form 1040 and listed Legacy's business as "construction".  The Statement SBE is not an Internal Revenue Service (IRS) form.  Respondent questions why petitioners reported Legacy's expenses on this non-IRS form and on Schedule E rather than a separate Schedule C.  But the manner of reporting is not dispositive of any issue in this case.  Respondent concedes as much in his posttrial answering brief, stating that "[r]egardless of how or why petitioners reported and claimed these deductions, the bottom line is petitioners were not involved in an active trade or business and thus, * * * [the deductions] were properly disallowed by respondent."

[*11] Falcon and Legacy expenses contributed to these NOL carryforwards. For Falcon, petitioners reported Schedule E losses of $194,304 for 2010 and $101,794 for 2011, as well as unreimbursed expenses of $164,996 for 2011. For Legacy, petitioners reported negative other income related to business investigation expenses of $319,182 for 2010 and Schedule E expenses of $663,662 for 2011. When combined with other items of income and loss reported on petitioners' 2010 and 2011 Forms 1040, these Falcon and Legacy expenses generated the claimed NOL carryforwards from 2010 and 2011.

## III.   Respondent's Determinations

In the notice of deficiency respondent disallowed the $819,956 Schedule C deduction for Falcon's expenses, the $648,118 Schedule E deduction for Legacy's loss due to unreimbursed expenses, and the $966,121 NOL deduction. As a result of these adjustments respondent determined that the correct amount of tax due from petitioners for 2012 is $407,214. Petitioners reported $38,555 of tax on their 2012 Form 1040, leaving the $368,659 deficiency.

Respondent further determined that petitioners are liable for an accuracy-related penalty under section 6662 for an underpayment due to negligence and/or a substantial understatement of income tax. On June 15, 2016, Revenue Agent Christian Donovici (RA Donovici), the revenue agent who performed the

**[\*12]** examination of petitioners' 2012 Form 1040, requested permission to assert the penalty under section 6662 from his immediate supervisor, Supervisory Revenue Agent Jill Sullivan (Supervisory RA Sullivan). Supervisory RA Sullivan approved the penalty that same day. On June 17, 2016, RA Donovici mailed to petitioners a Letter 950-Z (30-day letter), which asserted the section 6662 penalty. The 30-day letter included Form 4549-A, Income Tax Discrepancy Adjustments, which had been generated by an IRS computation specialist on June 8, 2016, at RA Donovici's request.

## OPINION

### I.  Burden of Proof

Generally, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a)(1), "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." See Higbee v. Commissioner, 116 T.C. 438, 442 (2001). Petitioners have not introduced credible evidence sufficient to shift the burden of proof to respondent under section 7491(a) as to any relevant factual issue. Therefore, petitioners generally bear the burden of proof.

[*13] II.   Business Expense Deductions

Whether petitioners are entitled to the Falcon Schedule C and the Legacy Schedule E deductions for 2012 is resolved by answering one question:  Were they carrying on a trade or business in that year?[8]

A.   Legal Background:  Carrying on a Trade or Business

A taxpayer must prove entitlement to any deductions and credits claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Section 162(a) "allow[s] as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Neither the Code nor the regulations provide a generally applicable definition of the term "trade or business".  Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987); McManus v. Commissioner, T.C. Memo. 1987-457, 1987 Tax Ct. Memo LEXIS 454, at *19, aff'd without published opinion, 865 F.2d 255 (4th Cir. 1988).  Determining the existence of a trade or business "requires an examination

_____

[8] We also answer this question for 2010 and 2011.  Whether petitioners were carrying on a trade or business in those years is partially determinative of the second issue in this case:  petitioners' entitlement to NOL carryforwards attributable to those years.  See infra pp. 31-33.

[*14] of the facts in each case." Commissioner v. Groetzinger, 480 U.S. at 36

(quoting Higgins v. Commissioner, 312 U.S. 212, 217 (1941)).

In examining the facts of each case to determine the existence of a trade or business we have focused on three factors: (1) whether the taxpayer undertook the activity intending to earn a profit; (2) whether the taxpayer is regularly and actively involved in the activity; and (3) whether the taxpayer's activity has actually commenced. E.g., Weaver v. Commissioner, T.C. Memo. 2004-108, 2004 WL 938293, at *6; McManus v. Commissioner, 1987 Tax Ct. Memo LEXIS 454, at *20. The third factor addresses timing, and the following oft-quoted test offers guidance:

> [E]ven though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized.

Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965) (fn. ref. omitted), vacated and remanded on other grounds, 382 U.S. 68 (1965).

Stated otherwise, a taxpayer must show "more than initial research into or investigation of business potential" to cross the threshold into "carrying on a trade or business". Glotov v. Commissioner, T.C. Memo. 2007-147, 2007 WL 1702618, at *2 (citing Dean v. Commissioner, 56 T.C. 895, 902 (1971), and McKelvey v.

[*15] Commissioner, T.C. Memo. 2002-63, 2002 WL 341044, aff'd, 76 F. App'x 806 (9th Cir. 2003)). Crossing that threshold does not require that the business succeed, but it must engage in business. Cabintaxi Corp. v. Commissioner, 63 F.3d 614, 620-621 (7th Cir. 1995), aff'g in part, rev'g in part, and remanding T.C. Memo. 1994-316.

Before crossing the threshold of carrying on a trade or business, the taxpayer is in the province of section 195. See Weaver v. Commissioner, at *5 ("Implicit in the foregoing definitions is the concept that a taxpayer must in fact be 'carrying on' a trade or business for expenditures to be deductible under section 162. This limitation is made explicit in section 195[.]").

Section 195(a) provides the general rule that no current deduction is allowed for start-up expenditures. See Yapp v. Commissioner, T.C. Memo. 2018-147, at *13, aff'd, 818 F. App'x 743 (9th Cir. 2020); see also Fishman v. Commissioner, 837 F.2d 309, 312 (7th Cir. 1988) (citing cases) ("In a long line of decisions under section 162, the courts (including the Tax Court) have held that 'pre-opening' expenses, that is, expenses incurred before the taxpayer's trade or business begins to operate (what we are calling 'start-up-costs'), are not deductible."), rev'g T.C. Memo. 1986-127. Although not deductible "before the day on which the active trade or business begins", sec. 195(c)(1)(A)(iii), start-up

**[*16]** expenditures may be deducted, or capitalized and deducted over time, upon a taxpayer's becoming actively engaged in a trade or business, sec. 195(b); sec. 1.195-1, Income Tax Regs.; see also Cabintaxi Corp. v. Commissioner, 63 F.3d at 619; Yapp v. Commissioner, at *13.

Section 195(c)(1) defines "start-up expenditure" to include any amount:

> (A) paid or incurred in connection with--
>
> > (i) investigating the creation or acquisition of an active trade or business, or
>
> > (ii) creating an active trade or business, or
>
> > (iii) any activity engaged in for profit and for the production of income before the day on which the active trade or business begins, in anticipation of such activity becoming an active trade or business, and
>
> (B) which, if paid or incurred in connection with the operation of an existing active trade or business (in the same field as the trade or business referred to in subparagraph (A)), would be allowable as a deduction for the taxable year in which paid or incurred.

The legislative history of section 195 states that start-up expenditures are those incurred to study and choose a potential business, and, once a business is chosen, to prepare to begin that business by compensating employees and consultants and traveling as needed. See H. Rept. 96-1278, at 10-11 (1980), 1980-2 C.B. 709, 712; S. Rept. 96-1036, at 11-12 (1980), 1980 U.S.C.C.A.N. 7293, 7301 (containing identical text).

[*17] The taxpayer must make the preliminary choices of whether to enter into business and which business to enter. If the taxpayer has not made these choices, at the most he is still incurring investigatory costs. See sec. 195(c)(1)(A)(i); Rev. Rul. 99-23, 1999-1 C.B. 998, 1000 (concluding that amounts spent hiring an investment banker to conduct research on several industries and evaluate publicly available financial information related to several businesses are "typical of the costs related to a general investigation" because they are "expenditures paid or incurred in order to determine whether to enter a new business and which new business to enter" and are therefore start-up expenditures under section 195).

If the taxpayer has made these choices, the next step is getting that business to "function as a going concern and perform[] those activities for which it was organized." Richmond Television Corp., 345 F.2d at 907. This is the step that allows the taxpayer to deduct expenses under section 162. The taxpayer "d[oes] not have to succeed, even so far as to have a single penny of income, in order to be engaged in a trade or business." Cabintaxi Corp. v. Commissioner, 63 F.3d at 620. But it must intend to engage in a business (make the "whether" and "which" choices) and perform activities for which it was organized.

For instance, in Cabintaxi the taxpayer had organized a corporation with the purpose of selling, installing, and maintaining automated transportation systems;

**[\*18]** received formal authorization from a German company which had developed such a system (named "Cabintaxi") to market the systems in the United States and Canada; and incurred expenses in an effort to sell the German system to Indianapolis and other North American cities. Id. The Court of Appeals for the Seventh Circuit, to which an appeal of this case would ordinarily lie under section 7482, found that Cabintaxi was engaged in the business of being a U.S. and Canadian distributor of the German company's automated transit system and that the selling expenses--which were "an integral part of being in the business of selling automated transit systems"--were deductible under section 162. Id. at 620-621 ("The business of being a distributor commences with the agreement to distribute the supplier's product, provided that the agreement is followed with reasonable promptitude by bona fide efforts to sell the product[.]" (citing McManus v. Commissioner, 1987 Tax Ct. Memo LEXIS 454, at \*22-\*23)).

Short of taking that step and performing the functions for which a business was organized, the taxpayer cannot deduct expenses. Cabintaxi Corp. v. Commissioner, 63 F.3d at 620, directs us to compare Jackson v. Commissioner, 864 F.2d 1521, 1526 n.7 (10th Cir. 1989), aff'g on this issue 86 T.C. 492 (1986). In Jackson v. Commissioner, 864 F.2d at 1523, the taxpayers organized a business to sell audio players/recorders and obtained a license to do so. But the taxpayers

[*19] "made [no] legitimate efforts to locate potential buyers for the [players/ recorders]", a finding which was "fatal to * * * [their] case". Id. at 1526 (first and second alteration in original) ("Merely possessing the legal capability to sell player/recorders by obtaining a license from the inventor, without actual efforts to sell the products, is insufficient to constitute carrying on a trade or business for purposes of section 162."). And in Richmond Television Corp., 345 F.2d at 907-- the case that gave us the oft-quoted "function[ing] as a going concern" test--the taxpayer could not currently deduct training costs incurred before and after issuance of a construction permit for a television station because the television station was not in business until it obtained its license and began broadcasting. See also Provitola v. Commissioner, ___ F. App'x ___, 2021 WL 2390370, at *4 (11th Cir. June 11, 2021) (holding that a company still engaged in the process of creating a manufacturable item had not begun to operate as a going concern because "it had not yet manufactured or sold any of the devices, the purpose for which it was organized"); Madison Gas & Elec. Co. v. Commissioner, 72 T.C. 521, 566-567 (1979) (rejecting the taxpayer's argument that the date of issuance of a provisional construction permit should be considered the date of commencement of the partnership business and holding that the expenses the taxpayer sought to deduct were preoperational costs of the partnership's initial activity and therefore must be

[*20] capitalized), aff'd, 633 F.2d 512 (7th Cir. 1980); McKelvey v.

Commissioner, 2002 WL 341044, at *3 (citing Reems v. Commissioner, T.C.

Memo. 1994-253) (finding that a taxpayer with a background in forestry who had

taken steps to start a tree-farming business was nonetheless not carrying on a trade

or business because "in neither of the years at issue did * * * [the taxpayer]

commercially harvest any trees or even decide which species of tree to plant"). In

each of these cases the taxpayer was still investigating or creating a trade or

business, or the business had not yet begun. See sec. 195(c)(1)(A).

Acquisition can be the means of beginning a trade or business: If a trade or

business is acquired, it is deemed to begin when the taxpayer acquires it. Sec.

195(c)(2)(B). And if a prior trade or business never ceased, the taxpayer need not

begin a new trade or business; business investigation expenses are deductible if

they are incident to an existing trade or business. See O'Donnell v. Commissioner,

62 T.C. 781, 785 (1974), aff'd without published opinion, 519 F.2d 1406 (7th Cir.

1975); Frank v. Commissioner, 20 T.C. 511, 513 (1953).

B.    Analysis:  Petitioners' Postreceivership Activities

Respondent argues that petitioners were no longer carrying on a trade or

business once the Morgan entities were placed into receivership in 2009, and

therefore the disallowed expenses (which were incurred after that time) are not

[*21] deductible under section 162.  He argues instead that the expenses are either personal expenses or expenses incurred in the search for a new trade or business.  If they are personal, then their deduction is barred by section 262(a), which disallows a deduction for "personal, living, or family expenses" unless the Code expressly provides otherwise.  If they were incurred in a search for a new trade or business, then they are start-up expenditures, and their deduction is barred by section 195 until petitioners begin a business.  Respondent does not dispute that the expenses at issue were paid or incurred.

Petitioners counter that they were carrying on a trade or business in 2012 and therefore Falcon's Schedule C aircraft-related expenses and Legacy's Schedule E business-search-related expenses are deductible under section 162 for that year.[9]

---

[9] Petitioners argue in the alternative that if the Falcon and the Legacy expenses are not deductible pursuant to sec. 162, then they are nonetheless deductible under sec. 165(c)(1) as losses incurred in a trade or business.  Sec. 165(c)(1) allows an individual a deduction for a loss that was incurred in a trade or business.  But if petitioners were not carrying on a trade or business in 2012, the expenses are not deductible under either section.  See O'Donnell v. Commissioner, 62 T.C. 781, 786 (1974) ("Nor can * * *[the taxpayer] draw any sustenance from section 165 in order to sustain an abandonment loss.  Our earlier rationale precludes a holding that * * * [the taxpayer's] loss was 'incurred in a trade or business' under section 165(c)(1) and the fact that * * * [the taxpayer] did no more than make a preliminary investigation without committing any funds to the Miami acquisition precludes any deduction for any loss 'incurred in any transaction entered into for profit' within the meaning of section 165(c)(2)."), aff'd without published opinion, 519 F.2d 1406 (7th Cir. 1975).

**[*22]** They present two narratives in support of this counterargument: first, Mr. Morgan's continued engagement with the homebuilding industry after the receiver was appointed; and second, Mr. Morgan's search for a new business to acquire. We consider each in turn.

1.    Continuation of Homebuilding Business

Petitioners argue that Mr. Morgan need not begin a new trade or business because the last one--homebuilding--never ceased. They point to his continued engagement with the Morgan entities and his new activities, such as the loan to Mr. Pyatt.

As for Mr. Morgan's continued engagement with the Morgan entities, the on-the-ground cessation of homebuilding activity and the order appointing LS Associates as receiver indicate that his prior homebuilding trade or business ceased in 2009. All CPMC employees were terminated in February 2009, and CPMC did not build additional homes after that point. This practical shutdown is consistent with the Morgan entities' financial situation and the Indiana superior court's March 2009 order appointing LS Associates as receiver, which gave it broad and exclusive powers to manage and liquidate assets.

And as for petitioners' argument that Mr. Morgan's lending activity was a continuation of his homebuilding business, his $180,000 loan to Mr. Pyatt in 2009

[*23] did not demonstrate regular and continuous activity in a homebuilding trade or business but rather a one-time loan to a friend so the friend could pursue a development opportunity and then repay the loan with interest. If anything, the loan would be part of a lending trade or business, but isolated and irregular loans to trusted individuals do not support that conclusion either. See Imel v. Commissioner, 61 T.C. 318, 323 (1973) (holding that a taxpayer's eight or nine loans over a four-year period was not a lending trade or business); Heinbockel v. Commissioner, T.C. Memo. 2013-125, at *31-*32 (holding that a taxpayer's occasional loans to her brother was not a lending trade or business).

Mr. Morgan's actions and words support our conclusion that he was no longer carrying on a homebuilding trade or business. From his perspective in September 2009, the receivership proceedings "shut the company down" and began a period of transition in his life. And his focus shifted to starting or acquiring a new trade or business. After decades, Mr. Morgan's homebuilding business had ceased.

Petitioners rely on Furner v. Commissioner, 393 F.2d 292 (7th Cir. 1968), rev'g 47 T.C. 165 (1966), to argue that "the intent to continue in a trade or business is the critical element in finding that efforts to do so are deductible" and "a taxpayer is able to retain his status of carrying on his * * * own trade or business

[*24] independent of receiving compensation from a particular employer." But Furner is readily distinguishable on its facts.

In Furner a junior high school history teacher "believed that her teaching required greater depth of subject matter than she possessed", wanted to take courses that were difficult to pursue part time, and therefore devoted one school year to full-time graduate study. Id. at 293. The school system in which she worked did not customarily grant leaves of absence, requiring her to resign to pursue her year of study. Id. She returned to teaching the following year. Id. The court found that her period of study was a "normal incident of carrying on the business of teaching". Id. at 294. It focused on "the broader question [of] whether the relationship of the course of study to intended future performance as a teacher is such that the expenses thereof can reasonably be considered ordinary and necessary in carrying on the business of teaching", noting the teacher's strategic choice to pursue a single-year course of study rather than spreading it out over many years. Id. at 294-295 (repeating the importance of "consideration of the relationship of the education with intended future resumption of business activity").

It is difficult to consider this relationship--purposeful break from activity to future resumption of activity--for Mr. Morgan because his "break" was

[*25] necessitated by the receivership; he used it to take time with family after decades of work; and while he eventually formed the intent to resume some business activity, he expressed uncertainty as to what that activity would be. The basic recognition in Furner that a brief, purposeful period studying an activity before returning to regular involvement in that activity does not end a trade or business cannot be stretched to fit the facts before us. Petitioners' argument that Mr. Morgan was in the homebuilding trade or business because he was "a partner in his home construction partnership [CPMC]", he "made efforts during 2009-2012 to continue" in that business, and "[his] intent was genuine" cannot overcome the evidence that he neither built nor sold homes in that period and was unsure whether he would return to the homebuilding industry.

We therefore find that Mr. Morgan was no longer carrying on a homebuilding trade or business following the appointment of LS Associates as receiver for the Morgan entities. After that time Mr. Morgan was no longer regularly and actively undertaking homebuilding activity with the intent to earn a profit. Appointment of a receiver does not always spell the end of a taxpayer's trade or business. But here it did. Petitioners recognize this reality, noting that CPMC "did cease its operations". Their argument that "Mr. Morgan did not likewise cease or abandon his interest in continuing to stay in business, but rather

[*26] uninterruptedly attempted to continue in business" is unavailing given our finding that petitioners did not commence another homebuilding trade or business before the end of 2012. We therefore reject petitioners' first theory for an active trade or business to which to attribute Falcon's aircraft maintenance expenses and Legacy's business search expenses.

### 2. General Search for a New Trade or Business

We next consider Mr. Morgan's activities related to Legacy and Falcon. Petitioners argue that Mr. Morgan's search for a new trade or business to acquire was itself an active trade or business in 2012. They point to the formation and use of Legacy, noting that it hired employees and engaged outside consultants. And they point to the support that Falcon provided Legacy in conducting that search, noting that it facilitated Legacy's business search as it once facilitated the Morgan entities' homebuilding--that "Falcon * * * [did] for Legacy what Falcon once did for CPMC." Respondent characterizes petitioners' argument as one that Mr. Morgan was "simply in the business of being in business" in an attempt to avoid section 195 by using Legacy and Falcon as "vehicle[s] to deduct all business investigation expenses."

Beginning with Legacy, we conclude that its general business search does not meet the "carrying on any trade or business" requirement of section 162. The

**[*27]** "business investigation expenses" that petitioners claimed and attributed to Legacy for the 2012 taxable year fit the definition of start-up expenditures in section 195(c)(1)(A)(i) as "amount[s] * * * paid or incurred in connection with * * * investigating the creation or acquisition of an active trade or business". Legacy paid employees and outside consultants to research a variety of industries and Mr. Morgan listed his time on his Legacy timesheets as 100% "business investigation/looking forward", both of which indicate that Legacy's activities were carried out in anticipation of beginning a trade or business. And because Mr. Morgan did not acquire a new business by the end of 2012, no business is deemed to have begun in that year under section 195(c)(2)(B).

Petitioners rely on Roberts v. Commissioner, 820 F.3d 247 (7th Cir. 2016), rev'g T.C. Memo. 2014-74, to argue that "a transition from one career to another is a business activity" and repeatedly state that "a career is not a personal activity." But Roberts focuses on section 183 and the existence of a profit motive in the taxpayer's horse-racing business. Id. at 254. As petitioners note in their posttrial brief, respondent "does not invoke section 183". In Roberts the taxpayer had chosen and was carrying on an identifiable activity (horseracing), and the Court of Appeals for the Seventh Circuit allowed a deduction for an improvement to that

[*28] activity because the taxpayer had a profit motive. Id. But in this case petitioners had not chosen an activity and were generally searching for a new business.

Petitioners also repeat two quotations in their briefs that, when examined in context, are demonstrably inapplicable to this case. First, from Primuth v. Commissioner, 54 T.C. 374, 379 (1970), they highlight the following proposition: "[F]or it is difficult to think of a purer business expense than one incurred to permit such an individual to continue to carry on that very trade or business". But the immediately preceding clause states that "[o]nce we have made our decision that the * * * [taxpayer] was carrying on a trade or business of being a corporate executive, the problem presented here virtually dissolves". Id. Not only have we not made the decision that petitioners were carrying on a trade or business, but the business expense in Primuth--a job-placement fee that resulted in the corporate executive's transitioning from one company on Friday to another company on the following Monday--is a far cry from petitioners' general business search expenses.

Second, from T.J. Enters., Inc. v. Commissioner, 101 T.C. 581, 589 (1993), aff'd, 67 F.3d 1445 (9th Cir. 1995), they highlight the Court's conclusion that "[i]t is well established that expenses incurred to protect, maintain, or preserve a taxpayer's business, even though not in the normal course of such business, may be deductible as ordinary and necessary business expenses." In T.J. Enterprises, Inc.,

[*29] the Court allowed a deduction for a fee paid to prevent an event of increase in a franchise agreement's royalty payment because it found that if the taxpayer had not paid the fee the business might not have survived. Id. at 592-593. Petitioners' position is that the economic recession created an event outside the normal course of business, entitling them to deduct expenses for 2010 through 2012 because they were simply trying to "protect, maintain, or preserve" their business. Their reading would widen the scope of section 162 beyond its statutory bounds by effectively eliminating the "carrying on" requirement.

In sum, Mr. Morgan was not carrying on a trade or business through his search for a new trade or business to acquire. We agree with respondent that petitioners cannot squeeze into section 162 and avoid section 195 by claiming that Mr. Morgan's trade or business was searching for a trade or business.

Nor can they squeeze into section 162 by arguing Falcon was in the consulting business during the year in issue; its activities by themselves did not constitute an active trade or business independent of the Morgan entities. Before 2009 Falcon aircraft were used by Mr. Morgan to further the Morgan entities' real estate development business. He would fly to various locations to view potential building sites, research development strategies, and check on current developments. Falcon serviced a broader homebuilding trade or business.

[*30] Petitioners attached Schedule C for Falcon to their 2012 Form 1040 and listed its principal business as "consulting", but they never established that the term encompasses anything other than transporting them and related individuals; Falcon did not lease its aircraft or provide services to any unrelated third parties at any time, and its only gross receipts came from petitioners and Legacy.

## C. Trade or Business Conclusion

We conclude that Mr. Morgan was no longer carrying on a trade or business within the meaning of section 162 after the Morgan entities were placed in receivership in 2009 and therefore sustain respondent's disallowance of the Schedule C and Schedule E deductions in issue.[10]

The absence of an active trade or business under the Code does not mean Mr. Morgan was not active in a colloquial sense--we have noted that his history of hard work continued in the postreceivership period. But receivership spelled the end of Mr. Morgan's homebuilding trade or business. And Mr. Morgan's continued activities in the aftermath of the recession and receivership--namely, the

---

[10] Respondent's determination that Falcon's "consulting" activity "does not meet the guidelines of carrying on a trade or business" under sec. 162 necessitated two corresponding adjustments on its Schedule C: a $201,654 reduction in other income (the amount petitioners paid for personal use of the plane) and a $315,000 reduction in gross receipts (the amount Legacy paid Falcon as a "consulting fee"). Consistent with our finding that Falcon did not constitute a trade or business, we sustain these corresponding adjustments.

**[\*31]** use of Legacy to search for a new trade or business and the continued existence of Falcon--did not constitute an active trade or business in 2010, 2011, or 2012.

## III.   NOL Deduction

The second issue in this case is whether petitioners are entitled to an NOL deduction for 2012 attributable to NOL carryovers from 2010 and 2011.

### A.   NOL Carryovers

Section 172 allows a taxpayer to deduct NOLs for a taxable year.  The amount of the NOL deduction equals the aggregate of the NOL carryforwards and NOL carrybacks to the taxable year.  Sec. 172(a).  Section 172(c) defines an NOL as the excess of deductions over gross income, computed with certain modifications specified in section 172(d).  Absent an election under section 172(b)(3), an NOL for any taxable year first must be carried back 2 years and then carried forward 20 years.  Sec. 172(b)(1)(A).  The NOL deduction is not an automatic right.  See Power v. Commissioner, T.C. Memo. 2016-157, at \*13 (citing United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955)).  Taxpayers bear the burden of establishing both the existence of NOLs and the amounts that may be carried over to taxable years in issue.  See Rule 142(a); Keith v. Commissioner, 115 T.C. 605, 621 (2000).

[*32] While 2010 and 2011 are not before us, we may determine the correct amount of NOL for those years as a preliminary step in determining the correct amount of an NOL carryover to 2012, the year in issue. See sec. 6214(b); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 274-275 (1990). NOLs may carry over under section 172 from the year in which they were incurred to another year only if the losses were the result of operating a trade or business within the meaning of section 162. See Lender Mgmt., LLC v. Commissioner, T.C. Memo. 2017-246, at *24 (citing Todd v. Commissioner, 77 T.C. 246, 248 (1981), aff'd, 682 F.2d 207 (9th Cir. 1982)).

Respondent argues that petitioners' 2010 and 2011 expenses cannot give rise to an NOL deduction because they are the same type as the expenses underlying the claimed Schedule C and Schedule E deductions for 2012--that is, Falcon and Legacy expenses--and petitioners were not carrying on a trade or business in any postreceivership year.

Legacy's expenses for 2010 and 2011 cannot carry over under section 172 because they were not the result of operating a trade or business within the meaning of section 162 during those years. See supra pp. 30-31. The same would be true for Falcon's expenses in those years, but petitioners claim that the Tax

[*33] Equity and Fiscal Responsibility Act of 1982 (TEFRA) precludes respondent from disallowing any claimed deduction with respect to Falcon.[11]

### B.    TEFRA-Affected Item

TEFRA partnerships are subject to special tax and audit rules. See secs. 6221-6234. Falcon is subject to the TEFRA audit procedures for 2010 and 2011.[12] TEFRA requires the uniform treatment of all "partnership item[s]". A partnership item is an item that is most appropriately determined solely at the partnership level. Sec. 6231(a)(3). If the IRS decides to adjust any partnership items on a partnership return, it must notify the individual partners of the adjustment by issuing a Final Partnership Administrative Adjustment (FPAA). Sec. 6223(a); see also Greenberg v. Commissioner, T.C. Memo. 2018-74, at *21 n.16.

Where no TEFRA audit is commenced and no FPAA is issued, "the tax treatment of all partnership items with respect to the[] partnership[] is final in

---

[11] Before its repeal, see Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(a), 129 Stat. at 625, part of TEFRA governed the tax treatment and audit procedures for many partnerships.

[12] For those years, Falcon elected to be treated as a partnership and Falcon's partners included Mr. Morgan and an S corporation. Because one of its partners is a pass-thru entity, Falcon is not subject to the small partnership exception. See sec. 6231(a)(1)(B)(i), (9); sec. 301.6231(a)(1)-1(a)(2), Proced. & Admin. Regs. TEFRA did not apply to Falcon for 2012 because in that year Falcon was taxed as a disregarded entity.

[*34] accordance with the tax return[] filed by the[] partnership[]." Roberts v. Commissioner, 94 T.C. 853, 857 (1990); see also Harris v. Commissioner, 99 T.C. 121, 124-125 (1992), supplementing T.C. Memo. 1990-80.  Respondent did not commence a TEFRA audit of Falcon for 2010 and 2011 and acknowledges that the time for doing so under section 6229(a) has expired.  Therefore, respondent must accept Falcon's 2010 and 2011 Forms 1065 as filed.

Items that are not treated as partnership items are nonpartnership items and are not resolved under the TEFRA rules.  Sec. 6231(a)(4).  Nonpartnership items that are dependent on determinations made at the partnership level are "affected item[s]".  Sec. 6231(a)(5).  The need for partner-level factual development is enough to except an item from the definition of a partnership item.  Greenwald v. Commissioner, 142 T.C. 308, 316-317 (2014).  There is no requirement that a partner-level determination actually result in a change to the determination made at the partnership level.  Domulewicz v. Commissioner, 129 T.C. 11, 20 (2007), aff'd in part, remanded in part sub nom. Desmet v. Commissioner, 581 F.3d 297 (6th Cir. 2009).

[*35] At least one affected item remains at issue and precludes the deductibility of the 2010 and 2011 Falcon losses: petitioners' outside basis in Falcon.[13] See Greenwald v. Commissioner, 142 T.C. at 317 (holding that outside basis is an affected item requiring partner-level determination); sec. 301.6231(a)(5)-1(b), Proced. & Admin. Regs.

Outside basis is a partner's adjusted basis in the partnership interest. William S. McKee, et al., Federal Taxation of Partnerships and Partners, para. 6.01 (4th ed. 2007). Partnerships generally do not report a partner's outside basis. A deduction for a partner's distributive share of partnership losses is allowed only to the extent of the adjusted basis of the partner's interest in the partnership at the end of the partnership year in which the losses occurred, and the losses cannot reduce the partner's basis below zero. Secs. 704(d), 705(a)(2). If the partner cannot establish his adjusted basis in his interest, then he cannot deduct any partnership

---

[13] Another nonpartnership item in issue is whether the passive loss limitation of sec. 469 applies because petitioners did not materially participate in Falcon. See Sellers v. Commissioner, T.C. Memo. 2020-84, at *9 n.4 ("It is well established that whether a partner's involvement in an entity was active or passive is a partner-level determination." (citing Estate of Quick v. Commissioner, 110 T.C. 172, 187 (1998), supplemented by 110 T.C. 440 (1998))). Respondent argues that in the postreceivership years Falcon's activities were limited to holding airplanes and aviation-related assets, and it therefore did not engage in any activity in which Mr. Morgan could materially participate. We do not reach the issue because we find that petitioners did not substantiate their outside basis in Falcon.

[*36] losses.  See sec. 704(d); Sennett v. Commissioner, 80 T.C. 825, 829 (1983), aff'd, 752 F.2d 428 (9th Cir. 1985).  "Proof of basis is a specific fact which the taxpayer has the burden of proving."  O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), aff'g T.C. Memo. 1957-193; see also Powers v. Commissioner, T.C. Memo. 2013-134, at *28-*30.  Further, taxpayers cannot rely solely on their own income tax returns to establish the losses they sustained.  Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979) (citing Roberts v. Commissioner, 62 T.C. 834, 837, 839 (1974)).

Petitioners rely on the partners' capital accounts reported on Falcon's 2010 and 2011 Forms 1065, which do not reflect Mr. Morgan's outside basis.  Mr. Rice testified that he and Somerset did not keep a separate schedule that showed outside basis because there were no differences between the capital account and outside basis.  But we must consider whether Mr. Morgan, as a partner, incurred costs that increased his outside basis or otherwise engaged in transactions that reduced his outside basis in Falcon.  In their posttrial brief petitioners argue that they substantiated Mr. Morgan's outside basis in Falcon by pointing to the purchase of a helicopter by other entities related to Falcon, but it is unclear from the record whether Mr. Morgan contributed property in the transaction.  Petitioners have not introduced their 2008 or 2009 Form 1040, and we therefore do not know whether

**[*37]** they deducted basis-reducing losses related to these other entities before 2010 and 2011. Petitioners have not introduced sufficient evidence supporting their outside basis in Falcon. They therefore failed to prove entitlement to deduct the NOLs, and we sustain respondent's determination.

In sum, we find that petitioners are not entitled to the NOL carryforward deduction because Legacy's 2010 and 2011 expenses were not deductible under section 162 and Falcon's distributive losses were limited by petitioners' failure to substantiate their outside basis.[14] Accordingly, we sustain respondent's disallowance of the NOL deduction for 2012.

IV. Section 6662(a) Penalty

Finally, we must determine whether petitioners are liable for the section 6662(a) accuracy-related penalty.

Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on the return that is attributable to "[n]egligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." Negligence includes "any failure to

---

[14] Respondent makes an alternative argument for disallowing the 2012 NOL deduction: Petitioners failed to report discharge of indebtedness income for 2011 that would have absorbed their claimed NOL carryforward from that year. We do not reach the issue because we find that petitioners otherwise are not otherwise entitled to the 2012 NOL deduction.

[*38] make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

The Commissioner bears the initial burden of production to show an individual taxpayer's liability for a penalty and is required to present sufficient evidence showing that the penalty is appropriate. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447. To meet this burden, in certain cases, the Commissioner also must show that he complied with the procedural requirements of section 6751(b)(1). See sec. 7491(c); Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).

Once the Commissioner satisfies his burden of production, the taxpayer bears the burden of proving that the Commissioner's penalty determination is incorrect or that the taxpayer has an affirmative defense such as reasonable cause. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

A.    Respondent's Burden of Production

1.    Section 7491(c) Negligence and/or Substantial Understatement

We find that respondent initially presented sufficient evidence showing that the negligence and substantial understatement penalties are appropriate. Petitioners reported expenses incurred from the operation of consulting and

[*39] construction businesses in 2012 and failed to present evidence that they were carrying on such businesses in that year.  See Glotov v. Commissioner, at *3 (finding that the Commissioner met the burden of production for a negligence penalty where evidence showed that the taxpayer was not carrying on a computer software business, contrary to the taxpayer's reporting position).  And the understatement of income tax in this case is $368,659.  This exceeds the greater of 10% of the tax required to be shown on the return ($40,721) or $5,000, and is therefore a substantial understatement under section 6662(d).

### 2.    Section 6751 Written Supervisory Approval

We also must decide whether the Commissioner complied with section 6751(b)(1), which provides that no penalty is allowed unless the "initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination".  He must show that written supervisory approval for any penalty was obtained before the first formal communication to the taxpayer of the initial determination to assess penalties, which includes a 30-day letter.  Clay v. Commissioner, 152 T.C. 223, 249 (2019), aff'd, 990 F.3d 1296 (11th Cir. 2021).

[*40] Petitioners argue that respondent failed to comply with section 6751(b) because supervisory approval of the accuracy-related penalty was not secured timely and because supervisory review of the penalty was not meaningful.

Petitioners' first argument fails. RA Donovici made a determination to assert the section 6662 accuracy-related penalty for both negligence and a substantial understatement of tax. On June 15, 2016, RA Donovici sent Supervisory RA Sullivan a memorandum requesting permission to assert a penalty. On that date, Supervisory RA Sullivan was RA Donovici's immediate supervisor. And on that date, Supervisory RA Sullivan approved the penalty by digitally signing the memorandum. Two days after receiving this approval, on June 17, 2016, RA Donovici mailed the 30-day letter to petitioners. Petitioners point out that Form 4549-A was produced on June 8, 2016, before supervisory approval was secured. But Form 4549-A was not mailed to petitioners before the date the penalty was approved. It was part of the 30-day letter mailed to petitioners two days after approval. We therefore find that respondent secured supervisory approval in a timely fashion.

Petitioner's second argument--that the supervisory review of the penalty determination was not meaningful because Supervisory RA Sullivan responded promptly to RA Donovici's request for permission to assert the penalty--also fails.

[*41] As we have explained, "'[w]e decline to read into section 6751(b)(1) the subtextual requirement' that respondent demonstrate the depth or comprehensiveness of the supervisor's review." Belair Woods, LLC v. Commissioner, 154 T.C. 1, 17 (2020) ("[T]he written supervisory approval requirement * * * requires just that: written supervisory approval." (quoting Raifman v. Commissioner, T.C. Memo. 2018-101, at *61)); see also Larkin v. Commissioner, T.C. Memo. 2020-70, at *69 ("[T]he question under section 6751(b)(1) is simply whether the supervisor in fact approved the penalty[.]"). Supervisory RA Sullivan approved the penalty by signing it "approved". We therefore find that respondent has established compliance with section 6751(b)(1).

Petitioners now bear the burden of proving reasonable cause and good faith for any portion of the underpayment. See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449.

B.      Reasonable Cause and Good Faith

A taxpayer may avoid a section 6662(a) penalty by showing that there was reasonable cause for any portion of the underpayment and the taxpayer acted in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances, including the taxpayer's efforts

**[\*42]** to assess the proper tax liability and the taxpayer's knowledge, experience, and education. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners contend that they had reasonable cause for the position they took on their Form 1040 because they reasonably relied on Mr. Rice and Somerset when reporting Falcon and Legacy expenses. Reasonable reliance on professional advice may constitute reasonable cause and good faith if the taxpayer proves, by a preponderance of the evidence, that (1) the adviser was a competent professional with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. See Alt. Health Care Advocates v. Commissioner, 151 T.C. 225, 246 (2018); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

        1.     Competent Tax Adviser

There is no precise threshold of competence that a tax adviser must have to justify reliance. Our practical test looks for expertise in the context of the facts of each case. CNT Inv'rs, LLC v. Commissioner, 144 T.C. 161, 224 (2015); see also Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99 (holding that an insurance agent who did not claim to be a tax professional and had a direct financial interest in the transaction at issue lacked sufficient expertise to advise on

[*43] complex life insurance); <u>Pankratz v. Commissioner</u>, T.C. Memo. 2021-26, at *24 (holding that a longtime employee who provided financial-related support to taxpayer and had a bachelor's degree in accounting lacked sufficient expertise to prepare a large and complex tax return); <u>Thousand Oaks Residential Care Home I, Inc. v. Commissioner</u>, T.C. Memo. 2013-10, at *41 (holding that an accountant with an M.B.A. degree who was a full-time return preparer and enrolled agent was competent to advise on employment-plan contributions).

Applying this practical test, we find that Mr. Rice was a competent tax adviser with sufficient expertise to justify reliance. He was a professionally licensed, experienced tax-return preparer with an accounting firm's staff at his disposal. He knew petitioners' personal and business affairs from his decades-long relationship with them. While he had not prepared a return for an entity in receivership, there is no indication that he was unfamiliar with how to deal with asset sales. Nor is there any indication that petitioners had reason to doubt his competence.

## 2. Provision of Information

To meet the second requirement of reasonable reliance, the taxpayer cannot "fail[] to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item." Sec. 1.6664-4(c)(1)(i), Income Tax Regs. A

**[\*44]** taxpayer is not obligated to share details that a reasonably prudent taxpayer would not know, or that he would neither know nor reasonably should know are relevant. CNT Inv'rs, LLC v. Commissioner, 144 T.C. at 228.

We find that petitioners provided necessary and accurate information to Mr. Rice and Somerset through Ms. Coyer, who would summarize all data necessary for their return and provide supporting documents. Mr. Rice would interact with Ms. Coyer throughout the year, and he had the opportunity to ask Ms. Coyer for clarification and additional input. Respondent argues that petitioners did not provide Mr. Rice with the documentation underlying the Legacy employee time breakdown, which Ms. Coyer prepared. But while it may have been a summary, there is no indication it was inaccurate, and Mr. Rice had the opportunity to request additional input from petitioners and Ms. Coyer. Cf. Babu v. Commissioner, T.C. Memo. 2020-121, at \*12-\*13 (holding that the taxpayer failed to meet this requirement by not mentioning engaging in 30,000 transactions and withdrawing over $3 million from a bank account during the tax year in issue).

### 3. Good Faith Reliance on Advice

The last requirement is that a taxpayer must have actually received advice and relied upon it in good faith. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99. Advice is "any communication, including the opinion of a professional

[*45] tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly". Sec. 1.6664-4(c)(2), Income Tax Regs.

Mr. Rice credibly testified that he worked with Ms. Coyer and Mr. Morgan in the years before 2012 to determine how to report unreimbursed partnership expenses related to Falcon, and that he reviewed documents provided to him by Ms. Coyer before entering information on petitioners' return. While petitioners did not review their 2012 Form 1040 with Mr. Rice before filing, evidence from prior years such as Falcon's modified expense reimbursement agreement (signed by Mr. Morgan) and Legacy's monthly meeting agenda from January 2011 (distributed to petitioners) indicate petitioners' awareness of and engagement with the issues in this case.

We find equally credible petitioners' reliance upon that advice because Mr. Rice and Somerset had been preparing petitioners' individual returns, the Morgan entities' returns, and Falcon's returns for over a decade. See Watts v. Commissioner, T.C. Memo. 2017-114, at *33-*34 (holding that the taxpayers' return position was taken with reasonable cause and in good faith because, although their long-term accountant's determination was incorrect, it was reasonable and prudent for the taxpayers to rely on his advice and direction as to

[*46] the intricate subject matter at hand, the sale of a partnership interest), <u>vacated and remanded on other grounds</u>, 747 F. App'x 837 (11th Cir. 2019).  That Mr. Morgan was a well-educated, sophisticated businessman does not foreclose his relying on his long-time tax adviser to prepare his return.  We therefore hold that petitioners are not liable for the section 6662 accuracy-related penalty.

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

<u>An appropriate decision will be entered</u>.